[Civ. No. 35140. First Dist., Div. Three. Sept. 11, 1975.]

LEMAT CORPORATION, Plaintiff and Appellant, v.
AMERICAN BASKETBALL ASSOCIATION, Defendant
and Respondent.

CHARLES E. BOONE, Plaintiff and Appellant, v.
AMERICAN BASKETBALL ASSOCIATION, Defendant
and Respondent.

COUNSEL

Bancroft, Avery & McAlister, Robert L. Dunn, Richards, Watson, Dreyfuss & Gershon, Allen E. Rennett and Louis M. Meisinger for Plaintiffs and Appellants.

Frederick P. Furth, John H. Boone, Clyde W. Stitt and Daniel S. Mason for Defendant and Respondent.

OPINION

**GOOD, J.***—Lemat Corporation, owner of the National Basketball Association (NBA) franchise for the Golden State Warriors (formerly

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

San Francisco) and Charles E. (Pat) Boone, part owner in 1967 of the then newly formed American Basketball Association (ABA) franchise for the Oakland Oaks, appeal from adverse judgments in actions they had separately filed against the ABA that were consolidated for trial. Lemat and Boone sought enforcement of an alleged indemnity agreement resting upon proceedings at an ABA trustees' meeting held in Denver on August 18 and 19, 1967, and a resolution contained in the minutes thereof. An understanding of the issues involved in the appeal requires a somewhat lengthy statement of the background of that meeting and both prior and subsequent events.

ABA was formed and incorporated as a Delaware corporation early in 1967. NBA had been the sole pro basketball league until that time. ABA intended to become a "major league" and envisioned a super-bowl type playoff between NBA and ABA champions. ABA's management was vested in a board of trustees, one member designated for each of the 11 franchises that had been issued. In June 1967 ownership of the Oakland franchise had vested in S. Kenneth Davidson and appellant Boone with Davidson as trustee therefor. At the time, Richard F. Barry III, now the outstanding super-star of pro basketball, had completed his first season (1965-1966) under contract to the Warriors with great success.[1] He signed with the Warriors for 1966-1967 and the contract contained an option for 1967-1968 and perhaps options for several years thereafter.[2]

There was uncontradicted evidence that during the formative period (spring-summer 1967) ABA and its franchised teams were experiencing the vicissitudes of any new league whose teams were unable to contract the services of any pro stars whose mere presence might draw a reasonable gate because those stars were all under contract to NBA teams. If ABA had to wait a year or two to develop its own stable of such from high school and college talent ready to turn pro, there was serious doubt that its teams could secure the kind of money necessary to finance a season. Further, its ability to recruit amateur players of potential star status was limited by NBA's established position. There were background noises about possible anti-trust violations and a player's serf or chattel status that resulted from the renewal clause (cf. fn. 11 *post*).

---

[1] At the time Barry's star quality was evident but it is doubtful that managers, owners, fans, lawyers or judges and, perhaps, not even Barry himself could have predicted the spectacular course of his career in sports and litigation.

[2] In *Lemat Corp. v. Barry* (1969) 275 Cal.App.2d 671 [80 Cal.Rptr. 240], Lemat apparently claimed Barry was committed to the Warriors for seven years.

In March 1967, ABA, at an Oakland meeting, held a draft, open or public as to college and high school talent and secret as to pros. Davidson, Oakland's trustee, drafted Barry for Oakland. Such draft created an exclusive right for Oakland among ABA teams to attempt to sign the drafted player. Again without contradiction, the evidence shows that at this meeting, Davidson was assured by George Mikan, ABA commissioner (an attorney and former Minneapolis star) and by William J. Erickson, ABA's attorney, that it would be proper to sign an NBA player if such player made the first advances—apparently a situation similar to "no raid" clauses of union contracts. The selection of Barry was made upon the advice of Bruce Hale, Barry's father-in-law, who became Oakland's coach and part owner of the franchise.

Until the incorporation of Oakland Basketball, Inc., to which the franchise was eventually transferred, the business arrangements of the partners owning the Oakland franchise was rather loose and depended upon oral agreements between Davidson and Boone. Sometime in the spring of 1967, Commissioner Mikan called Boone and asked him to assume the responsibilities of putting a team together and getting the show off the ground. Mikan thought Davidson was dragging his heels. Thereafter, while Boone was performing in Reno, Barry and his wife came backstage after the performance and Boone asked Barry if he was available and interested in playing for Oakland. Barry answered affirmatively and stated some conditions and requirements he would want. Further negotiations resulted in Barry signing an option dated June 19, 1967, and expiring October 2, 1967, which gave Boone the right to sign Barry to a three-year contract at $75,000 per year plus a share in gross gate receipts. It was provided that if Barry were legally enjoined from playing for Oakland in the 1967-1968 season, September through May (training beginning in August), the three years would commence October 2, 1968. If he could not play for Oakland, he was free to play for the Warriors if he so elected.

On the same date, Boone executed a document that guaranteed Barry an annual income of not less than $75,000 per year for three years commencing October 2, 1967, and not less than $30,000 per year for five years commencing October 2, 1970. Boone also executed an assignment to Barry of a 15 percent interest in a proposed corporation to which the ABA Oakland franchise was to be transferred.

On the following day, the Warriors gave Barry notice they were exercising their option for the 1967-1968 season. Barry refused to sign

and stated he would not play for the Warriors that season. Lemat Corporation filed suit in the San Francisco Superior Court (Lemat Corp. v. Barry, No. 580287) and procured a preliminary injunction dated August 8, 1967, enjoining Barry from playing pro basketball for anyone but the Warriors until September 30, 1968 (August injunction *post*). On August 15, Lemat filed suit in the Los Angeles County Superior Court (No. 915895) against Boone, Davidson, Hale and Oakland Basketball, Inc., as the corporation to which the Oakland ABA franchise had been or was to be assigned. The suit sought $1.5 million general damages for inducing Barry to repudiate his contract with the Warriors and exemplary damages of $3 million by reason of the defendants' "willful, deliberate and malicious" acts and "tortious intent to injure the [Warriors] and appropriate the good will" generated by Barry's association with them. This suit received considerable nationwide coverage in news and sports columns of the press.

On August 18, 1967, the regularly scheduled ABA trustees meeting was convened at Denver with representatives of 10 member teams, including Oakland, present. Commissioner Mikan, William Erickson, ABA's general counsel, Bill Eilers, Oakland's counsel and Bruce Hale were also present. Erickson and Eilers discussed Lemat's recently filed suit between themselves. Eilers was seeking an indemnity agreement covering obligations and legal fees arising out of the litigation, before proceeding any further with Barry. Erickson considered an indemnity resolution prepared by Eilers as "politically unacceptable" and suggested revisions. The minutes of the meeting reflect that Erickson introduced the subject of the Barry litigation. Then Eilers reported the current status of the Barry negotiations and advised the trustees of the "considerable expense and personal involvement of the Oakland owners in the Barry legal position." The upshot of a "long discussion" was the proposal and seconding of a resolution revised in accordance with Erickson's suggestions: "BE IT RESOLVED, that to the extent that the Oakland franchise of the American Basketball Association shall incur any obligation by reason of claims brought against it as a result of its signing Rick Barry or matters resulting therefrom, the A.B.A., by means of this resolution, agrees to assume two-thirds of any such obligation and from this point forward the A.B.A. hereby agrees to reimburse the Oakland franchise for one-third of all legal expenses attributable to the litigation concerning Mr. Barry above referred to." The minutes proceed: "After additional lengthy discussion, the resolution was adopted; 4-For, 2-Against . . . , 4-abstaining," with the absence of one trustee noted.

OBI then proceeded to sign Barry to a contract, basically blank, on September 29, 1967. Barry was paid $75,000 for 1967-1968 as had been guaranteed. Salary ($75,000 plus a gate percentage per year) and time of service (three years beginning October 2, 1968, or sooner if the injunction were lifted) were supplied by amendment on October 31, 1967. The August injunction was not lifted.[3] Barry chose not to play for the Warriors and "sat out" the 1967-1968 season. He played in the ABA for four seasons beginning 1968-1969.

On November 30, 1971, Lemat v. Boone, et al. (L.A. No. 915895) was settled and a stipulated judgment for $1 million was entered against Boone, Davidson and Hale, who assigned to Lemat their claimed rights under the August resolution for indemnity as to two-thirds of the obligation.[4] ABA refused Lemat's demand and Lemat as assignee filed the present action against ABA to recover $666,667 for breach of the claimed contract of indemnity.

Boone and his associates retained their alleged rights under the resolution as against one-third of the legal fees expended in defense of litigation related to the Barry deal. Boone sued ABA to recover one-third of the legal expenses in defending L.A. No. 915895. The Alameda County Superior Court consolidated the two cases for trial. All parties waived jury. After commencement of trial the parties agreed to a bifurcation of the issues and to first dispose of the issue of liability. After five days of trial and argument, ABA moved for judgment pursuant to Code of Civil Procedure section 631.8. This was granted. The court found that said resolution did not create a contractual obligation between ABA on the one hand and Boone or Davidson on the other; and if it did, it was illegal. It interpreted the agreement to cover only the owner of the Oakland franchise, which it found was OBI on the date of the resolution. Its interpretation was to the effect that neither the obligations of Boone et al. arising out of the judgment in L.A. No. 915895 nor the legal expenses incurred in defense thereof were contemplated or covered by the resolution. Judgment in favor of ABA was accordingly entered. The appeals of Lemat and Boone present the following issues.

I. DID THE RESOLUTION RECEIVE THE VOTES NECESSARY FOR PASSAGE? No.

---

[3]See *Lemat Corp.* v. *Barry, supra*, 275 Cal.App.2d 671.

[4]ABA's counsel characterized the transaction as collusive both at trial and on appeal but points to no evidence in the present record nor to any statute that would vitiate it.

■ Article IV, section 3 of the ABA bylaws requires that extraordinary obligations must be approved by a majority vote of all trustees before payment[5] by the commissioner. The fact that the potential liability that might arise under the resolution was indeterminate at the time of the meeting does not alter the nature of obligations entailed in it. The trial court correctly found that the resolution purported to create an extraordinary expense. The finding is supported by substantial evidence and may not be disturbed on appeal. (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d, 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805].) There were 11 trustees at the time of the vote. Approval of six of them was required. The resolution received only four approving votes. It is accordingly unnecessary to explore the contentions that are based upon Delaware corporation law.

II. Is ABA Estopped to Deny that the Resolution was an Indemnification Agreement? Yes.

■ Respondent contends that estoppel is not available to appellant because it was not pleaded, although it was raised in the trial court. As plaintiffs below, appellants could not have known that their claims must ultimately rest upon a claimed estoppel. Because a "plaintiff is not advised of the defenses that may be pleaded, he is not required to plead an estoppel in order to overcome any affirmative matter set up in the answer or by way of defense." (*First Nat. F. Corp.* v. *Five-O Drilling Co.* (1930) 209 Cal. 569, 576 [289 P. 844]; cf. *Higson* v. *Montgomery Ward & Co.* (1968) 263 Cal.App.2d 333, 342 [69 Cal.Rptr. 497].)

In classic or traditional cases of equitable estoppel four elements must be proved: "(1) that the party to be estopped must be apprised of the facts; (2) he must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon; (3) the party asserting the estoppel must be ignorant of the true state of the facts; and (4) he must rely upon the conduct to his injury." (*Crestline Mobile Homes Mfg. Co.* v. *Pacific Finance Corp.* (1960) 54 Cal.2d 773, 778 [8 Cal.Rptr. 448, 356 P.2d 192].)

■ The evidence shows that ABA had no more knowledge of the invalidity of the vote than Boone and Davidson had. The minutes recite

---

[5]This requirement is tucked away in a section dealing with the powers and duties of the commissioner in paying bills. However, the provision would be meaningless if a capital expenditure or extraordinary obligation could be created by less than the six votes required.

that it was passed. Also the testimony shows that thereafter everyone involved assumed that it had been passed. Erickson, the attorney for the ABA, stated that at no point did he believe that the vote was insufficient. Any knowledge of the bylaws imputed to the trustees must also be imputed to Davidson, who was a trustee. Davidson was acting as Boone's agent in representing the franchise. Therefore, either the ABA was not apprised of the facts or Boone and Davidson had equal knowledge. In either case, the first or third essential of an equitable estoppel is missing.

But California cases on estoppel have not strictly adhered to the four-point test set forth above. Exceptions have arisen to prevent injustices. (E.g., *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].) When dealing with corporate contracts which were invalid due to lack of authorization by a proper vote of the directors, courts have not allowed a corporation to avoid liability when it has received and retained the benefits of the contract. (*Main* v. *Casserly* (1885) 67 Cal. 127 [7 P. 426]; *Blood* v. *La Serena Land and Water Co.* (1901) 134 Cal. 361 [66 P. 317]; *Gribble* v. *Columbus Brewing Co.* (1893) 100 Cal.67 [34 P. 527]; *First Nat. F. Corp.* v. *Five-O Drilling Co., supra,* 209 Cal. 569; *Tierney & Lawford* v. *Wilshire Cafe Co.* (1930) 209 Cal. 605 [289 P. 621]; *Bradley* v. *Butchart* (1933) 217 Cal. 731, 734 [20 P.2d 693]. *See also, Higson* v. *Montgomery Ward & Co., supra,* 263 Cal.App.2d 333.) Inquiry must then focus upon the question whether ABA received and retained any benefits from the signing of Rick Barry by Oakland.

In the context of the exhibits and minutes as amplified by uncontradicted testimony of the discussion of the resolution at the meeting, the consideration therefor was the continuation of Oakland's efforts to sign Rick Barry to an ABA players' contract which if successful would be a "break-through" and make it easier for other ABA teams to contract players of established star status.[6] There is evidence that Boone and Davidson would not have proceeded to sign Barry if ABA would not agree to share the risk of potential litigation; that the trustees were informed that the potential liabilities of the recently filed litigation were such that undertaking further action in the Barry matter involved risks that the Oakland owners believed they could not assume without league

---

[6]The minutes state: "After a long discussion it was the consensus that Rick Barry was more than another ballplayer and that the position to be taken by the Oakland franchise would be of considerable importance to the whole League . . . [and] that once Oakland had made a decision the League wanted in some way to support its franchise in this involvement." The resolution was offered "[I]n order that the full expense of potential litigation should not fall alone on the Oakland franchise . . . ."

support. Erickson, ABA's attorney, explained that the matter presented a challenge that ABA had been working toward since its inception and the league "needed to take a stand as a league if we were to succeed."[7] The name of the game is money. Although difficult to apportion a percentage of increased gate or public interest accruing from the presence of a particular name player, increased gate and potential television revenue were at stake. Concerning Barry, the minutes of the August meeting state that "it was the consensus that . . . the position to be taken by the Oakland franchise would be of considerable importance to the whole League." Although no concrete benefits may have accrued to ABA during the 1967-1968 season, the evidence reflects that the publicity surrounding the situation was, in itself, of value. Again without contradiction, the evidence shows that during the four years Barry played for ABA it received exactly the benefits it hoped would flow from a successful outcome of Oakland's attempt to procure Barry's signature to a contract.

To allow the ABA to receive these benefits and later to repudiate the contract would be inequitable. The cases cited above establish that the ABA is estopped from asserting its failure to properly adopt the resolution. Therefore, a contractual obligation exists. Conclusions of Law 2 and 3[8] are incorrect.

### III. Is the Indemnity Void as an Illegal Contract? No.

The statutes involved in respondent's contention of illegality are Civil Code sections 2773, 2774 and 1668.[9] ■ If section 1668 applied to

---

[7]The unsettled issue was the validity of NBA's option provision in its players' contracts whereby owners of a particular franchise had a one year's option to renew at the end of any contract and also a like option for another year during any optioned renewal. The question was whether an option to renew, in effect, *in perpetuum* constituted a restraint of trade. If so, did it infect the whole contract, the first year's option or only attempted renewals after the first option had been exercised.

[8]"2. That such resolution did not constitute an indemnity agreement by the ABA in favor of the Oakland franchise, . Pat Boone, Davidson or Hale for the following alternative reasons: [¶] (a) Said resolution, being for an extraordinary obligation within the meaning of Article IV, Section 3 of the By-Laws of the ABA, was not approved by a majority of all the Trustees of the ABA; and/or [¶] (b) said resolution was for a nonextraordinary obligation, said resolution was not approved by a majority of the Trustees present at the meeting, as required by Delaware law (8 Del. Code § 141(b)). [¶] 3. That said purported resolution is void because it was not adopted in accordance with Title 8, Chapter I of the Delaware Code (General Corporation Law), the Articles of Incorporation of the ABA or the By-Laws of the ABA."

[9]Civil Code section 2773 provides: "An agreement to indemnify a person against an act thereafter to be done, is void, if the act be known by such person at the time of

agreements to indemnify persons against unlawful acts then *all* agreements to indemnify against violations of the law would be illegal. The distinctions made in section 2773 and section 2774 between unlawful acts "thereafter to be done" and an unlawful act already done would be given no effect. Statutes are to be construed as a whole and, when reasonably possible, full force and effect given to all of their provisions. (*Hough* v. *McCarthy* (1960) 54 Cal.2d 273, 279 [5 Cal.Rptr. 668, 353 P.2d 276].)

The distinction between an exemption (§ 1668) whereby a person seeks to avoid liability to a victim who has suffered due to that same person's unlawful conduct and an indemnity has been recognized by the courts. (Compare *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693] (true exculpatory agreement) with *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 48 [41 Cal.Rptr. 73, 396 P.2d 377]; *John E. Branagh & Sons* v. *Witcosky* (1966) 242 Cal.App.2d 835, 838-839 [51 Cal.Rptr. 844]; and *County of San Joaquin* v. *Stockton Swim Club* (1974) 42 Cal.App.3d 968, 971-972 [117 Cal.Rptr. 300] (indemnity agreements).) A public policy consideration exists. An exemption may deprive a victim of compensation for injuries but an agreement to indemnify a person who may be responsible for a loss is additional assurance that the loss will be compensated. In support of its claim that section 1668 is applicable to indemnity agreements, respondent cites *Abbott* v. *Western Nat. Indem. Co.* (1958) 165 Cal.App.2d 302 [331 P.2d 997]. However, the reference to section 1668 therein is dicta and, in any event, is inapplicable to the facts before us. Conclusion of Law 4[10] in this case is incorrect. Section 1668 is not applicable to indemnity agreements.

Conclusion of Law 5 is based on Civil Code section 2773 which voids indemnification of future acts known to be unlawful by the actor. The finding necessarily implies that the indemnity agreement involved a

doing it to be unlawful."

Civil Code section 2774 provides: "An agreement to indemnify a person against an act already done, is valid, even though the act was known to be wrongful, unless it was a felony."

Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[10]"4. Assuming the above resolution was validly adopted, any purported indemnity agreement is against the policy of the law under California Civil Code section 1668 and unenforceable as a contract which has for its object '. . . directly or indirectly, to exempt anyone from responsibility for his own . . . willful injury to the person or property of another, or violation of law, whether willful or negligent, . . .' "

future act. The indemnity agreement was to encourage the Oakland franchise to continue its efforts to sign Barry to a contract. While the agreement also involved an act already done (the signing of the option and the guaranty), when both past and future acts are covered by an indemnity agreement, section 2773 should apply. ■ Both section 2773 and section 2774 are intended to prevent the encouragement of illegal acts. Section 2773, concerned with future acts, involves a potential for *increased* damage to society from future unlawful acts. In section 2774, the act and any damage therefrom have been accomplished. We, accordingly, hold that when any part of an indemnity agreement involves a future act, section 2773 applies.

■ The resolution contemplated the future signing of Rick Barry to a contract. The contract was entered into about six weeks after the Denver meeting. The starting date was October 2, 1968, *or* the earliest date that Barry would be free from injunctions. The question is whether Boone and Davidson *knew* at the time the contract was signed that the act of signing Barry was unlawful. Civil Code section 2773, by its language, requires actual knowledge. Even if, in retrospect, Boone and Davidson perhaps should reasonably have known that signing Barry was illegal (because of their knowledge and experience) the contract would not be void. *Compare* Civil Code section 2773 (be known) with Penal Code section 311.4 (knows or has possession of such facts that he *should reasonably know*).

Findings 21 and 22 are that on or after August 8, 1967, Boone and Davidson knew it would be unlawful to sign Barry.

A search of the record reveals nothing to support these findings. From January 1967, when the ABA began to function, until the *permanent* injunction was issued in the case of *Lemat Corp.* v. *Barry, supra,* 275 Cal.App.2d 671, nobody *knew* whether the option clause in Barry's contract with the Warriors was valid or not. There is no contradiction to Boone's and Davidson's testimony that they sought legal advice and acted in a good faith belief that the Warriors' option was not valid and that Barry was free to sign with the Oakland franchise.[11] After the August 8th preliminary injunction in Lemat v. Barry, *supra,* and the August 15th Los Angeles suit filed against them by Lemat, Boone and

---

[11]In addition, Barry had told them that he had independent legal advice and assured them that he was free to contract. The Warriors' option that was subject to question is set forth at 275 Cal.App.2d 671, *supra.* It contains a renewal of the option to renew for one year during any renewal period.

Davidson knew of the possibility that the courts might uphold the validity of the Warriors' option. The fact that they took measures to protect themselves in such event is not evidence that they knew on August 8, 1967, that Barry's signing of the option in the preceding June was unlawful or that it would be unlawful for them to proceed if the initiative for the eventual contract (in the face of the injunction) came from Barry. The Oakland-Barry contract was worded so that it would not become effectual as to playing date until the preliminary injunction was dissolved.

In *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889], the court stated: " 'The granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy. It merely determines that the court, balancing the respective equities of the parties, concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' " The permanent injunction did not issue until July 1968, well past the time Barry was signed and 11 months after the indemnity resolution had been acted upon.

An indemnity against a future *knowing* violation of an injunction is unlawful and void. (*Buffendeau* v. *Brooks* (1865) 28 Cal. 641.) But there is no evidence that Boone and Davidson attempted to have Barry play for Oakland in violation of the August injunction. The documents were carefully written to leave Barry legally free to play for the Warriors so long as the injunction was in effect. There is no contradiction to the evidence that as to both option and eventual contract, Boone and Davidson and "the consensus" of ABA's trustees believed that the actions would be unlawful only if the initiative came from either of them and Barry did not make his own decision whether or not to play for the Warriors during 1967-1968.[12] The uncertainty of the law[13] at the time of option and contract removes any inference of actual knowledge of illegality by Boone and Davidson or by the ABA trustees.

[12]The four abstentions from the vote on the resolution occurred after a favorable "consensus" had been reached. But a "lengthy discussion" developed about whether or not the resolution should be spread upon the minutes. If it became public there was risk that the league itself might become a defendant in the $4.5 million worth of pending litigation. Further, there is evidence that the two negative votes were rested on the proposition that the league should not assist one team's recruitment program while not assisting others and not upon any known illegality of either the option or the contract.

[13]*Lemat* v. *Barry, supra,* 275 Cal.App.2d 671 was decided two years after the August meeting. The record shows that Lemat was claiming that Barry was bound to the

## IV. SHOULD THE TRIAL COURT'S INTERPRETATION OF THE RESOLUTION BE AFFIRMED? NO.

A franchise is a privilege to field a team in a given geographic area under the auspices of the league that issues it. It is merely an incorporeal right. Sale or transfer of an ABA franchise is subject to the approval of a majority of the 11 trustees (ABA Bylaws, art. VII, § 6). The facts that (a) on August 18, 1967, the California Commissioner of Corporations had theretofore issued its consent for Oakland Basketball, Inc. to issue its stock, and (b) that the incorporating franchise owners had agreed that the franchise would be transferred to OBI in exchange for stock when issued did not, in and of themselves, perfect the proposed transfer. It was still subject to the approval of ABA's trustees. Finding No. 6, that OBI was the sole indemnitee because it owned the franchise at the time of the Denver meeting, is unsupported by the evidence.

The finding is also contrary to the purport of the minutes of the August meeting and their references to the "personal involvement" of the owners and "the position to be taken by the Oakland franchise" in the Barry deal. The evidence, without contradiction, shows that Davidson, as one of the owners of the Oakland franchise, was seeking personal indemnification from ABA before Oakland would proceed further with Barry.

The findings and conclusions further interpret the resolution as not covering any liability arising out of the option already signed "because said 'Option' was merely an irrevocable offer to Pat Boone and owned exclusively by him but which he was not bound to exercise" (e.g.,

---

Warriors for seven seasons commencing 1967-1968, the seven-year limitation arising not from contract but from the provisions of Labor Code section 2855 which limited contracts for personal service (servitude) to seven years. Lemat was only one-seventh successful. By implication, at least, the renewal upon renewal phase of the option was deemed invalid and the option was enforced for only the first year. To that extent, Oakland's advice of counsel as to invalidity proved sound. If the trial court had found that the Warriors' contract embraced an option renewable for seven successive years inseverable as to successive years, the option might have been deemed wholly void as an unreasonable restraint of trade in violation of anti-trust laws. The Oakland franchise was not chargeable with foreknowledge of a court's decision. The case of *Flood* v. *Kuhn* (1972) 407 U.S. 258 [32 L.Ed.2d 728, 92 S.Ct. 2099], states that baseball is the only pro sport exempt from federal anti-trust laws. Comment therein indicates that some participating judges were strongly critical of baseball's perpetual reserve clause but reluctantly bowed to baseball's established·exemption. We may further note that the opinion in *Washington Capitols Basketball Club, Inc.* v. *Barry* (N.D.Cal. 1969) 304 F.Supp. 1193 and its affirmance (9th Cir. 1969) 419 F.2d 472 indicate that neither court thought that the 1967 contract between Oakland and Barry was illegal.

Conclusion 6(e)). But the option recites that Boone and Davidson were the owners of the Oakland franchise. The option ran to the "owners." The three documents of June 19, 1967 are but a single contract. In view of the unambiguous language of the option (signed only by Barry), the fact that the two documents comprising the consideration for the option were signed only by Boone did not constitute Boone the exclusive owner of Barry's option. There is not the slightest inference in the record that Boone considered the option as his sole right or that he ever attempted to use it for his sole advantage. All of the testimony concerning the presentation of the resolution at ABA's Denver meeting compels the conclusion that it contemplated any obligation incurred by the owners of the Oakland franchise arising from Oakland's prior and future dealings with Barry. The minutes and testimony show that Lemat v. Boone was discussed.[14] In the light of the presentation by Oakland's attorney, strongly corroborated by the testimony of ABA's attorney as well as subsequent events, the minutes and the resolution would be meaningless if Oakland Basketball, Inc. was the only indemnitee contemplated by the resolution. At that time OBI had had nothing to do with Barry. The only reasonable inference that could be drawn from the undisputed evidence is that the parties intended to indemnify the obligations of the defendants in Lemat v. Boone to the extent of two-thirds thereof and also for one-third of their attorneys' fees.

■ Our conclusion that the resolution contemplated any obligation arising out of Lemat v. Boone is supported by the rule that the construction given to an ambiguous contract by the acts and conduct of the parties with knowledge of its terms before any controversy has arisen as to its meaning is entitled to great weight and, when reasonable, will be adopted by the court. (*Universal Sales Corp.* v. *Cal. etc., Mfg. Co.* (1942) 20 Cal.2d 751, 761-762 [128 P.2d 665].) On or about December 18, 1967, Oakland's attorney (Eilers) requested $7,293.63 from ABA for its share of legal fees arising from Lemat v. Boone. ABA's attorney's (Erickson) testimony shows that he recommended payment. Eilers testified that he received ABA's check therefor. It was signed, according to Erickson's recollection, by ABA's Commissioner Mikan. Neither ABA's counsel nor Mikan denied forwarding the check. At least as to one-third of any attorneys' fees in Lemat v. Barry, ABA's counsel and its chief executive officer believed that the resolution was an effective indemnity agreement covering Lemat v. Boone.

---

[14]See footnote 6 *ante.*

The findings and conclusions that any obligation incurred by Davidson or Boone in Lemat v. Boone was not covered by the resolution are also erroneous and find no support in the evidence before the court. The resolution stated that "to the extent that the Oakland franchise . . . shall incur any obligation by reason of claims brought against it as a result of its signing Rick Barry or matters resulting therefrom, the ABA . . . agrees to assume two-thirds of any such obligation. . . ." In the context of the discussion, the words "signing of Rick Barry" refer to the June 19 option which the trustees knew had been signed. The signing of the September 29 (Oct. 31 finalization) contract was a matter that resulted therefrom. It flowed from "the position to be taken" by Oakland in the Barry matter—a matter deemed "of considerable importance" to the ABA. The evidence that Oakland would not have proceeded without the support of ABA is uncontradicted. The June 19 option and September 29 contract represent a single continuing transaction. In these circumstances, to interpret the resolution to exclude obligations arising out of Lemat v. Boone as not within the contemplation of the resolution is unreasonable and unsupported by any evidence.

The judgment is reversed. The cause is remanded to the trial court with instructions to strike its order granting defendant's motion for judgment; and to vacate the findings, conclusions and judgment and to resume trial pursuant to the provisions of Code of Civil Procedure section 631.8.

Draper, P. J., and Scott, J., concurred.

A petition for a rehearing was denied October 10, 1975, and respondent's petition for a hearing by the Supreme Court was denied November 6, 1975.