[Civ. No. 16731. Third Dist. May 4, 1981.]

CITY OF FRESNO, Plaintiff and Appellant, v.
CALIFORNIA HIGHWAY COMMISSION et al., Defendants and
Respondents.

690

COUNSEL

James A. McKelvey, City Attorney, James C. E. Barclay, Assistant City Attorney, and Hilda Cantu Montoy, Deputy City Attorney, for Plaintiff and Appellant.

George Deukmejian, Attorney General, Arthur C. de Goede, Assistant Attorney General, Richard G. Rypinski, Robert F. Carlson, Ralph E. Livingstone, Jr., and Orrin F. Finch for Defendants and Respondents.

## Opinion

PERLUSS, J.*—We are called upon to interpret the meaning, scope and effect of the so-called "freeway agreements," or contracts which the state enters into with cities pursuant to certain statutes relating to freeways. In such agreements the state, in contemplation of building a freeway which has been approved by the California Highway Commission (commission), agrees to pay for and make the necessary changes in city streets (such as overcrossings and frontage roads) while the city agrees to the closing of certain city streets and other changes in local roads to be done at state expense, and to accept future control and maintenance of such changes.

The state, acting through the then Department of Public Works (now the Department of Transportation), entered into such a freeway agreement with the City of Fresno in 1962 after the commission had adopted a resolution in 1961 declaring a certain section of State Highway Route 125 in the City of Fresno to be a freeway. Subsequent identical agreements were entered into at various times until 1968, covering State Highway Routes 41, 180 and 168 in Fresno.

The freeways have never been built and the City of Fresno filed this action for declaratory relief, injunction, accounting and impressing an equitable trust in an effort to prevent the state from building any other freeways in the state as to which freeway agreements have been entered more recently than the original 1962 agreement in question and to compel the state to build the Fresno freeways without delay.

The trial court sustained the state's demurrer to this complaint without leave to amend and granted the state's simultaneous motion for judgment on the pleadings. The judgment on the pleadings "orders and determines" that (1) the freeway agreements alleged in the complaint do not bind the state to construct any freeway at a certain time; (2) the

*Assigned by the Chairperson of the Judicial Council.

state is not required by law to construct a freeway within the City of Fresno; and (3) the state may not be ordered to budget for or to construct freeways in the City of Fresno. Reciting that "[p]laintiff's prayer for declaratory relief having been thus determined," it was further ordered in the judgment that the complaint failed to state a cause of action, and the demurrer having been sustained without leave to amend, "the plaintiffs action is dismissed." Plaintiff appeals.

Plaintiff raises four basic questions on appeal, which are:

(a) Do "freeway agreements" bind the state to construct certain freeways where the city has performed some of its obligations and has based land-use decisions and other actions in reliance on the state's indicated intent to build the freeways?

(b) Is the state equitably estopped from ceasing to build a freeway when some preliminary work has been completed by it?

(c) Did the pleadings state facts sufficient to constitute a cause of action and, if so, was it error per se to sustain the demurrer or to grant judgment on the pleadings?

(d) Did the trial court abuse its discretion in sustaining the demurrer without leave to amend and rendering judgment on the pleadings?

We answer each of the above questions in the negative and shall affirm the judgment.

*Facts*

The facts significant to this appeal are not in dispute.[1] The general demurrer and motion for judgment on the pleadings were premised on the assumption all facts stated in the complaint were true. (*McHugh* v. *Howard* (1958) 165 Cal.App.2d 169, 174 [331 P.2d 674]; see 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 800, p. 2413.) ■ A motion for judgment on the pleadings has the same basic purpose and effect as a general demurrer, and like a demurrer is confined to the face of the pleading under attack. (*Buck* v. *Standard Oil Co.* (1958) 157 Cal.App.2d 230, 235 [321 P.2d 67]; see 4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, §§ 162, 164, pp. 2817, 2819.)

---

[1] As stated by defendants: "There is only an issue of law respecting the legal effect of the freeway agreements, as to which the parties disagree."

The complaint discloses the following facts which are of most significance to plaintiff's position on appeal.

1. The state acquired and cleared 50 percent or more of the real property in Fresno needed for construction of freeways 41, 180 and 168.

2. The state constructed, completed and opened a portion of freeway 41.

3. The state commenced construction on freeways 168 and 180.

4. The state spent in excess of $60 million for the acquisition and construction of freeways 41, 168 and 180.

5. The city based land-use decisions, including actual maintenance and construction projects, on construction of the freeways pursuant to the freeway agreements.

6. The city closed city streets, relocated city streets and constructed frontage roads and other local roads pursuant to the freeway agreements.

7. The city has spent a sum greater than $10 million for local street improvements as part of its coordinated traffic system which includes the freeways in reliance upon the state's performance of the freeway agreements.

8. Approximately 14 years from the date of the first agreement, defendants ceased activities in furtherance of freeway construction in the City of Fresno. According to the state, cessation of activities was due to lack of funds.

9. The state's cessation of freeway construction activities has left the City of Fresno bisected by the real property acquired and cleared for the freeways and has created a shambles and eyesore on the property.

10. After the state had ceased further performance on Fresno's freeways due to a scarcity of funds, it had proceeded in adopting schedules and appropriating funds pursuant to third-party freeway agreements that were more recent in time than the freeway agreements which are the subject of this action. Also, the state continued to enter into new free-

way agreements with other parties. Those actions showed that ample funds were available to continue construction of Fresno's freeways.

11. The city is informed and believes that a sum exceeding $309 million had been diverted to nonhighway accounts by the state which thereby negated the state's financial inability to continue performance of the freeway agreements.

12. On or about September 23, 1976, the commission announced a new six-year plan which included construction of a small section of freeway 41 but excluded construction for freeways 168 and 180 and the remainder of freeway 41.

I

We hold the documents known as "freeway agreements" do not obligate the state to build or complete a freeway.

There is no conflicting extrinsic evidence as to the meaning of the documents. The trial court construed them as a matter of law. Under these circumstances an appellate court "must make an independent determination of the meaning . . . ." (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]; see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 259-260, pp. 4249-4251.)

As we interpret these agreements they provide for very limited obligations upon the part of the state and the city. The city agrees to the closure of certain city streets, construction of frontage roads, relocation of city streets and a pedestrian undercrossing—all as shown on maps attached to the agreements. The state agrees to make these changes at its expense. The city agrees to accept control and maintenance of the changes at its expense. The state agrees to acquire all real property necessary for the freeways and to hold the city harmless from any claims for damages resulting from the changes.[2]

We do not find any language which legally obligates the state to commence or complete construction of any planned freeway. The lan-

---

[2]A typical "freeway agreement" (one which was involved in this case) is attached hereto as appendix "A."

guage of the agreements conforms to the statutory authorization for the state to enter into such agreements. In the statutes they are referred to as "street or highway closing agreements." (Sts. & Hy. Code, § 100.21.)[3] The basic statutory provision which sets forth the scope and content of such agreements is Streets and Highways Code section 100.2, which reads in pertinent part as follows: "The department is authorized to enter into an agreement with the city council or board of supervisors having jurisdiction over the street or highway and, as may be provided in such agreement, to close any city street or county highway at or near the point of its interception with any freeway or to make provision for carrying such city street or county highway over or under or to a connection with the freeway and may do any and all work on such city street or county highway as is necessary therefor. No city street or county highway shall be closed, either directly or indirectly, by the construction of a freeway except pursuant to such an agreement . . . ."

This limited theme is followed throughout the statutes relating to such agreements, which are principally contained in Streets and Highways Code sections 100.2 through 100.25. The tenor of these provisions is that the agreements are intended by the Legislature to be just what is reflected in those agreements which are before us, i.e., preliminary and limited agreements to provide assurances to cities (or counties) on the part of the state that all the necessary work on local streets and roads will be done at state expense on proposed freeways in return for the consent of the cities (or counties) to the closure of certain streets and roads and the building of others, to be maintained thereafter by the city or county involved.

It is clear from the legislative pattern laid down for such agreements that no more is to be read into their language than is necessary to provide for the accommodation of local streets and roads to the freeway plans, at the expense of the state. This pattern emerges when the basic section 100.2 of the Streets and Highways Code (quoted in pertinent part above) is read in conjunction with section 100.25 of that code, as follows: "In addition to the other matters that may be covered by the agreement authorized under Section 100.2, provisions for improve-

---

[3]Section 100.21 provides in part: "Whenever a *street or highway closing agreement* is required by Section 100.2, the department shall not acquire, . . . any real property for a freeway through a city until such an agreement is first executed with the city council, . . ." (Italics added.)

ments, revisions or extensions of city streets or county highways leading to or from a freeway, deemed by the department to be necessary in accommodating the freeway traffic in making proper connections between the existing system of city streets or county roads and the freeway, may be included in such agreements and the department may perform such work as a part of the freeway construction."

Freeway agreements and the provisions of the Streets and Highways Code above referred to have been the subject of only one decision which did not deal directly with the question before us. However, the court in *Town of Emeryville* v. *Durkee* (1954) 127 Cal.App.2d 152 [273 P.2d 282], dealt with a freeway agreement in which the attached map indicated a service road in a certain place was to be built by the state and the state was preparing to construct it in a different location. The state had requested the city to agree to the changed location but the city refused. The court held that the state was permitted under the agreement to make this change, since the state "did not agree to construct a service road" but only engaged to "'make such changes affecting city streets in accordance with the said plan' or as said plan may be modified by agreement." (*Id.,* at p. 155.) Although the *Emeryville* case is not dispositive of the issues in this case, it is indicative of the strict construction which should be given the freeway agreements made under the applicable statutes.

We construe these agreements strictly as did the court in the *Emeryville* case. So doing, we find in their language no undertaking by the state of any contractual obligation to actually complete the building of any freeway. The only binding contractual language relates to things the state will do in preparation for the completion of a freeway, should one be completed. Such an interpretation of these agreements is in accord with the views of our courts when asked to consider their effect on property values for purposes of an inverse condemnation suit. Thus, in *Smith* v. *State of California* (1975) 50 Cal.App.3d 529, 535 [123 Cal.Rptr. 745], the court held that such an agreement is a "general plan" not "certain of implementation . . . ." In *Johnson* v. *State of California* (1979) 90 Cal.App.3d 195, 198-199 [153 Cal.Rptr. 185], it was said: "Throughout the design phase of a highway project, alterations and modifications of the proposed project may occur; in recent years, with considerable frequency, route location adoptions have been rescinded by the highway commission as a result of public disapproval of a project, environmental problems or fiscal constraints. In some cases, routes have been deleted from the state highway system by the Legisla-

ture after considerable design work has been done on a proposed project and substantial amounts of right-of-way have been acquired." And in *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144, 152 [148 Cal.Rptr. 640, 583 P.2d 165], the entire freeway was abandoned; the court recognized this possibility under the freeway agreements and stated: "The need for flexibility in planning, changing the design of, or even abandoning a proposal for a highway militates against the theory that an action for inverse condemnation lies for the general effects of such conduct."[4]

## II

The city, for the first time on appeal, raises the issue of estoppel of the state from "denying ... its duty to build [the freeways]." We need not engage in a discussion of whether the city may raise this issue for the first time on appeal, since the state has seen fit to address it on its merits and we have decided to do likewise. (Cf. *Lemat Corp.* v. *American Basketball Assn.* (1975) 51 Cal.App.3d 267, 275 [124 Cal.Rptr. 388]; *Atha* v. *Bockius* (1952) 39 Cal.2d 635, 645 [248 P.2d 745].)

The established rule is that estoppel may not be invoked against the state (or other public agency) unless "in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 496-497 [91 Cal.Rptr. 23, 476 P.2d 423].) The city recognizes this rule but contends it meets the test. We disagree, for as recently pointed out in *Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 28 [157 Cal.Rptr. 706, 598 P.2d 866], the doctrine of estoppel is not available to "'defeat the effective operation of a policy adopted to protect the public.'" And, "no court has expressly invoked principles of estoppel to contravene directly or indirectly any statutory or constitutional limitations."

We believe that to apply estoppel in this case against the state[5] would contravene public policy and basic statutory and constitutional limita-

---

[4]However, the cause was remanded for an award of damages for reasons not here pertinent.

[5]We are assuming, arguendo, that the city could establish the presence of the four basic elements of an estoppel, i.e., (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party assert-

tions. The limitations implicit in the statutory plan for freeway development have already been discussed. In addition, a judicial order requiring, in effect, an act of the Legislature to appropriate money for what is recognized as a discretionary purpose would infringe upon the doctrine of separation of powers. (See *Board of Supervisors* v. *California Highway Commission* (1976) 57 Cal.App.3d 952, 961-962 [129 Cal.Rptr. 504].)

The cases indicate an estoppel should not be applied here even if the state *had* made an express promise to build the freeways. It has been held that a county could not be estopped by a water company from refusing to carry out its unenforceable agreement to abandon a roadway behind the company's proposed dam. (See *County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817 [186 P.2d 124, 175 A.L.R. 747]; see, also *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 497.)

In *State of California* v. *Haslett Co.* (1975) 45 Cal.App.3d 252 [119 Cal.Rptr. 78], state officers agreed to lease a building to Haslett, who then spent $2 million on improvements. The lease agreement was held void because violative of the statute of frauds and because it had not been approved by the officer designated by statute. The court held that these statutes, designed to protect the public against improvident or secret action, would be thwarted by application of an estoppel; therefore, an estoppel could not be raised to render effective the oral agreement to make the lease. (*Id.,* at pp. 257-258; see also *Pettitt* v. *City of Fresno* (1973) 34 Cal.App.3d 813 [110 Cal.Rptr. 262].)

### III

█ The superior court properly refused to enjoin the California Highway Commission from allocating appropriate funds and the Department of Transportation from constructing freeways outside the City of Fresno.

The proper form of action would have been to seek a writ of mandate (requiring the performance of an alleged public duty) and the sought-after remedy of injunction was procedurally improper. (See *Moore* v. *Superior Court* (1936) 6 Cal.2d 421, 423-424 [57 P.2d 1314].) Irrespective of this procedural ground for upholding the trial court, we

---

ing the estoppel has a right to believe it is so intended; (3) the asserting party must be ignorant of the true facts; and (4) he must rely on the conduct to his injury. (See *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

would uphold it on substance had the proper writ been sought. There was nothing unlawful in the acts sought to be stopped. The commission and the department were lawfully exercising their duties under the statutes. The commission allocates funds appropriated by the Legislature and the department carries on the administrative function of constructing the freeways. (See *Financial Indem. Co.* v. *Superior Court* (1955) 45 Cal.2d 395, 402 [289 P.2d 233].) Under such circumstances, a writ of mandate should not issue. (*Board of Supervisors* v. *California Highway Commission, supra*, 57 Cal.App.3d at p. 961.)

## IV

There was no cause of action stated for an accounting since no fiduciary relationship was alleged or other circumstance calling for such a remedy; and we conclude from the record that no such cause exists. (See *Brea* v. *McGlashan* (1934) 3 Cal.App.2d 454, 460 [39 P.2d 877]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 675, p. 2301.)

## V

No cause of action existed for a constructive (involuntary) trust. Such a trust is imposed upon "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act . . . ." (Civ. Code, § 2224.) The purpose of a constructive trust is to rectify fraud—not to enforce the alleged intent of the parties. (*Gama* v. *County of Kern* (1960) 179 Cal.App.2d 1, 5 [3 Cal.Rptr. 380].) Such a trust cannot be imposed upon the public treasury under the circumstances of this case since nothing was "wrongfully detained." (Civ. Code, § 2223; *Tainter* v. *Broderick Land & Inv. Co.* (1918) 177 Cal. 664, 667 [171 P. 679]; *Simpson* v. *Gillis* (1934) 1 Cal.2d 42, 54 [32 P.2d 1071].)

## VI

In light of the foregoing, we hold the trial court's ruling on the demurrer and entry of judgment on the pleadings was both procedurally and substantively correct and did not constitute an abuse of discretion.

A trial court may properly sustain a general demurrer to a declaratory relief action without leave to amend when, as here, the controversy presented can be determined as a matter of law. (*California State Employees' Assn.* v. *Flournoy* (1973) 32 Cal.App.3d 219,

240-241 [108 Cal.Rptr. 251].) Also, a trial court may dispose of an unmeritorious controversy, such as this, by granting judgment on the pleadings in favor of the defendant. (*Aarons* v. *Brasch* (1964) 229 Cal. App.2d 197, 199 [40 Cal.Rptr. 153].) The grounds for judgment on the pleadings can be the same as those for sustaining the demurrer, and the two are properly made in the same case. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, §§ 161-164, pp. 2816-2819.)

■ Abuse of discretion is arbitrary determination, capriciousness or "whimsical thinking." The trial court must have made a ruling which "exceeds the bounds of reason" in order to constitute an abuse of discretion. (*People* v. *Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65]; *State Farm etc. Ins. Co.* v. *Superior Court* (1956) 47 Cal.2d 428, 432 [304 P.2d 13].) This is not such a case.

Relief, if any, for the City of Fresno and similarly situated public agencies must come from legislative changes.

The judgment is affirmed.

Reynoso, Acting P. J., and Carr, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 1, 1981.