[No. D048211. Fourth Dist., Div. One. Apr. 20, 2007.]

POWAY ROYAL MOBILEHOME OWNERS ASSOCIATION et al.,
Plaintiffs and Appellants, v.
CITY OF POWAY et al., Defendants and Respondents.

CITY OF POWAY et al., Plaintiffs and Respondents, v.
POWAY ROYAL MOBILEHOME OWNERS ASSOCIATION et al.,
Defendants and Appellants.

COUNSEL

Mitchell & Gilleon, James C. Mitchell; and V. Frank Asaro for Plaintiffs and Appellants and for Defendants and Appellants.

Stradling Yocca Carlson & Rauth, Douglas J. Evertz and Thomas P. Clark, Jr., for Defendants and Respondents and for Plaintiffs and Respondents.

McDougal, Love, Eckis, Smith & Boehmer and Lisa A. Foster for Defendants and Respondents and for Plaintiffs and Respondents City of Poway and Poway Redevelopment Agency.

## OPINION

**McCONNELL, P. J.**—This case arises from the City of Poway's (the City) two-step plan to divest itself of ownership of the Poway Royal Mobilehome Park (the Park). The City held one hearing in which it approved resolutions allowing it to issue tax-exempt bonds and loan the proceeds to the Poway Redevelopment Agency (Redevelopment Agency) for its purchase of the Park, and the Redevelopment Agency to later loan the proceeds and resell the Park to Wakeland Housing and Development Corporation (Wakeland) or its subsidiary, on the condition that it obtain a determination of tax-exempt status from the Internal Revenue Service (IRS). If Wakeland or its subsidiary did not qualify, the Redevelopment Agency would retain ownership of and manage the Park so the tax-exempt status of the bonds would not be jeopardized.

Plaintiffs, Poway Royal Mobilehome Owners Association and 273 of its members (sometimes collectively the Owners Association), appeal a judgment of dismissal entered after the trial court sustained without leave to amend the demurrer of defendants, the City, the City Council of the City of Poway (City Council), City Manager James Bowersox, and the Redevelopment Agency (sometimes collectively the City). The Owners Association contends the court erred by finding it may not maintain promissory estoppel and related claims against the City arising from its alleged breach of oral

promises to provide the Owners Association with "a real, true and non-illusory opportunity to purchase" the Park at fair market value. Additionally, the Owners Association contends the court abused its discretion by denying it leave to file a third amended complaint to attach a resolution of the City Council in an effort to satisfy the requirement of a written contract. We affirm the judgment.

Additionally, the Owners Association challenges the judgment in the City's action to validate its two-step plan to divest itself of the Park and associated bond financing. The Owners Association contends the court ignored that during the City's public hearing under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) (26 U.S.C. § 147(f)), it failed to submit evidence that Wakeland or its subsidiary qualified for tax-exempt bond financing, or that the Park met the requirement of being a " 'qualified residential rental project,' " meaning "20 percent or more of the residential units . . . are occupied by individuals whose income is 50 percent or less of area median gross income" (20-50 rule). (26 U.S.C. § 142(d)(1)(A).) We agree the TEFRA hearing was insufficient, and accordingly reverse that judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

The Park has 399 spaces and is situated on approximately 50 acres of land. In January 1991 the Redevelopment Agency purchased the Park, intending to stabilize rents and preserve affordable housing. In 1995 the Redevelopment Agency transferred ownership of the Park to the City. Also in 1995, the City issued bonds in the amount of $31,770,000, which paid off debt related to the Redevelopment Agency's purchase of the Park in 1991. City staff and contract employees managed the Park until 2004, when that responsibility was transferred to Wakeland.

In 1999 the City adopted a long-term goal for the divestiture of its mobilehome parks. The City orally advised tenants of the Park that when and if it decided to sell the Park it would give them an opportunity to purchase it. The Owners Association represented tenants in seeking private ownership, and the City knew 70 percent of the Park's tenants were willing, ready and able to purchase the Park at fair market value.

In November 2004, however, the City announced its intent to sell the Park "to a [26 United States Code section] 501(c)(3) nonprofit housing corporation

---

[1] To the extent we are reviewing rulings made at the pleading stage, we take the factual background from allegations of the first and second amended complaints, assuming their truth. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 171 [132 Cal.Rptr.2d 490, 65 P.3d 1255].)

using tax exempt bond financing," which would exclude the Owners Association and residents of the Park as purchasers since they cannot qualify as a nonprofit entity. Nonetheless, in February 2005 the Owners Association submitted a proposal to the City to purchase the Park. The following June the City rejected the proposal and agreed to sell the Park to the Redevelopment Agency, which would resell it to Wakeland, a nonprofit housing corporation, contingent on it qualifying for tax-exempt status under federal law.

The City then filed a complaint for validation of its sale of the Park and associated tax-exempt bond financing. The complaint alleged the City would first sell the Park to the Redevelopment Agency for $35.6 million, its asserted fair market value, plus reserve deposits to ensure the Park's successful operation. To finance the purchase, the City agreed to issue bonds not to exceed $32 million and loan the proceeds to the Redevelopment Agency, and to take an additional note from it for approximately $9.5 million. Wakeland would then purchase the Park from the Redevelopment Agency for $35.6 million, plus reserve deposits, and would assume the Redevelopment Agency's rights and obligations under the bond financing documents and $9.5 million loan agreement with the City.

The Owners Association answered the complaint and contested the legality of the City's actions. Additionally, the Owners Association filed a first amended complaint against the City for promissory estoppel and declaratory relief. The parties stipulated to the consolidation of the two actions.

The first amended complaint alleged the City and Redevelopment Agency "orally and publicly, and in certain instances, in writing, expressed [an] intent" to allow the Owners Association and tenants to purchase the Park "on terms that are non-illusory, true and real, that reasonably relate to the [P]ark's fair market value and are customary and usual for any sale to tenants/residents of a mobilehome park where the ownership will be converted to residential ownership." The City allegedly breached the promise by not offering the Park to the Owners Association and tenants on reasonable terms, but rather "concoct[ing] a sales price, terms and a financing scheme" for the Park that eliminated Owners Association or tenants as purchasers. Specifically, the City required tax-exempt bond financing; provided nonprofit housing corporation bidders, including Wakeland, with financing information and Park financial information, but refused to provide the same information to the Owners Association; gave the Owners Association an unreasonably short period to submit a purchase proposal; set a closing date for the sale so soon it precluded the Owners Association from complying with the statutory process for converting the Park to resident ownership; and allowed nonprofit housing corporations to submit offers on the Park that did not require the payment of any cash.

The first amended complaint also alleged that in reliance on the City's representations, tenants of the Park signed or renewed leases, financed mobilehome purchases, relinquished the opportunity to move to other mobilehome parks and anticipated earning equity on their mobilehome spaces. The complaint sought an order requiring the City to provide the Owners Association and tenants of the Park "with a price and terms for them to purchase the [P]ark that are true, real and non-illusory, is at the fair market value of the [P]ark and upon customary and usual, fair and reasonable terms for sale to tenants/residents." Alternatively, the complaint prayed for $21 million in economic damages and damages for emotional distress.

The City demurred on the ground the promissory estoppel doctrine may not trump the requirement that public agency contracts must be adopted in accordance with statutory procedures that require, for instance, formal approval and a writing signed by the appropriate official. The court issued a tentative order sustaining the demurrer without leave to amend. After a hearing, however, the court granted the Owners Association leave to amend.

In December 2005 the Owners Association filed a second amended complaint, adding a cause of action for breach of the implied covenant of good faith and fair dealing based on leases between the City and Park tenants. The complaint alleged the leases incorporate by reference California's Mobilehome Residency Law (Civ. Code, § 798 et seq.), which requires an owner to give notice to tenants of the intent to sell a mobilehome park (Civ. Code, § 798.80), and the notice the City gave the tenants here was a "sham" because it was not "notice of an intent to sell the park on true, real and non-illusory terms."

The promissory estoppel cause of action remained essentially the same, but added that the City unfairly offered bond financing and subsidized the sale to Wakeland, and alleged the City "engaged in a sham, non-arms length transaction with Wakeland, which transaction will have the inevitable result of substantially increasing the present rents at the [P]ark to service the excess non-recourse debt the City and the [Redevelopment] Agency are creating." Regarding the City's representations, the second amended complaint alleged the "City and Agency, through members of the City Council, Bowersox, and employees of the Agency, including, but not limited to, David Narevsky, orally, and publicly, and in certain circumstances, in writing" expressed that intent.

The City again demurred and the court sustained the demurrer without leave to amend. The court determined the second amended complaint did not allege unusual circumstances to justify a claim for promissory estoppel against a public agency, and estoppel would thwart the protection of the

statute of frauds and statutory procedures for public contracts. The court also found the complaint failed to state a cause of action for breach of the implied covenant as "such a cause of action may not extend beyond the terms of the contract in force between the parties," and in any event, the City complied with the notice requirement.

The Owners Association moved for reconsideration, arguing it could provide "the previously alleged writing" to confirm the City's promise. The Owners Association offered the minutes from the City Council's July 20, 1999 regular meeting, in which the City Council approved a consent calendar that included item No. 16, the "Adoption of Long-Term Goal for City and Redevelopment Agency Mobile Home Parks and Haley Ranch Estates" (Long-Term Goal). The draft of the Long-Term Goal, prepared by the City's housing commission, notes the Redevelopment Agency and the City had worked together to own and operate mobilehome parks, including the Park, "as a way of providing stable ownership and rents at these properties. The Housing Commission has requested and received approval from the City Council to develop a long term plan and goals for these properties to guide the City and [Redevelopment] Agency." The draft also stated the goal for transferring ownership of mobilehome parks was "[t]o insure an ownership and rent structure which maintains and enhances the quality and service of these properties," and as a matter of policy the City "should design a strategy which would transfer ownership to an entity such as a non-profit corporation, resident ownership/cooperative or similar structure which will insure the ownership operates the properties consistent with this policy."

The Owners Association also offered the deposition testimony of the City's deputy director of redevelopment, Narevsky, who co-authored the Long-Term Goal draft. He testified the term "non-profit corporation" as used in the policy section of the above draft meant a "charitable organization, nothing more than that." A proposed third amended complaint added the sentence, "A true and correct copy of a City Council Resolution confirming and ratifying any verbal promises is attached as Exhibit 2." It did not include any reference to Narevsky's testimony.

In a tentative ruling the court denied the motion, explaining the language of the Long-Term Goal draft did not require sale of the Park to the Owners Association, and it was not a binding document signed by the City. After a hearing, the court affirmed its ruling, and on April 13, 2006, it entered a judgment of dismissal.

As for the validation action, in October 2005 the parties had stipulated to the City's filing of a supplemental complaint to reflect changes in the

agreement between the City and Wakeland for purchase of the Park. The purchaser would now be Poway Royal Estates, LLC (PRE), a Wakeland entity.

A hearing was held in February 2006, after which the court took the matter under submission. On March 1, it granted the City's request for validation and entered judgment. We discuss facts pertaining to the validation action below.

## DISCUSSION

### I

#### *The Owners Association's Action*

##### A

###### *Standard of Review*

In reviewing the propriety of the sustaining of a demurrer, the "court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] . . . The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) "While the decision to sustain or overrule a demurrer is a legal ruling subject to de novo review on appeal, the granting of leave to amend involves an exercise of the trial court's discretion." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501 [82 Cal.Rptr.2d 368].)

##### B

###### *Promissory Estoppel*

####### 1

"In California, under the doctrine of promissory estoppel, 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such

action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.' [Citations.] Promissory estoppel is 'a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced.' " (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [96 Cal.Rptr.2d 747, 1 P.3d 63].) The elements of promissory estoppel are: (1) a clear promise, (2) reliance, (3) substantial detriment, and (4) damages " 'measured by the extent of the obligation assumed and not performed.' " (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 692 [21 Cal.Rptr.3d 732].)

■ It is well established that "an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public . . . .' " (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal.Rptr. 23, 476 P.2d 423] (*Mansell*); see *City of South San Francisco v. Cypress Lawn Cemetery Assn.* (1992) 11 Cal.App.4th 916, 923 [14 Cal.Rptr.2d 323].) " 'The courts of this state have been careful to apply the rules of estoppel against a public agency only in those special cases where the interests of justice clearly require it.' " (*Mansell, supra,* at p. 495, fn. 30.) The " 'facts upon which such an estoppel must rest go beyond the ordinary principles of estoppel and each case must be examined carefully and rigidly to be sure that a precedent is not established through which, by favoritism or otherwise, the public interest may be mulcted or public policy defeated.' " (*Ibid.*)

2

We conclude the second amended complaint does not allege exceptional circumstances necessary to justify application of the promissory estoppel doctrine against the City, and leave to amend would not cure the defect.

The second amended complaint alleged the City breached a promise to the Owners Association and Park tenants by requiring tax-exempt bond financing for purchase of the Park. The Owners Association submits the City's financing mechanism excluded it from purchasing the Park because "a residents' organization converting a park to private ownership cannot ever qualify as a charity, a prerequisite to obtaining the bond financing required by the City." The second amended complaint also alleged the City deprived the Owners Association of a true opportunity to purchase the Park because it set the selling price above the Park's fair market value. At the hearing on the demurrer on the first amended complaint, the Owners Association argued the City offered the property to Wakeland "at a price that we believe we're going to show is almost $10 million more than the property is worth."

The second amended complaint sought an order requiring the City to provide the Owners Association and Park residents "with a price and terms for them to purchase the [P]ark . . . that are true, real and non-illusory," meaning "at the fair market value of the [P]ark and upon customary and usual, fair and reasonable terms for sale."

The Owners Association asserts that because it did not allege the City was required to actually sell it the Park, its claim is not for breach of contract and the trial court erred by relying on public contract law in sustaining the demurrer. We reject the assertion. The Owners Association's theory is that the City breached an agreement that purportedly ties its hands in several respects: it must conduct the sale of the Park in a certain manner, which excludes the acceptance of offers only from nonprofit housing corporations relying on tax-free bond financing; it must include the Owners Association in the bid process even if it determines the Owners Association's operation of the Park is infeasible and not in the best interest of the City, the Park or its tenants;[2] and it is precluded from asking for or accepting more than the Owners Association considers fair market value for the property. For instance, the City would have to reject Wakeland's offer of $35.6 million, even though an independent appraiser valued the property at that amount, as the Owners Association deems it substantially above fair market value. We agree with the trial court that the Owners Association's action is actually for breach of contract, and the City may not put itself in such a situation absent compliance with proper procedures.

■ It is undisputed that the City is a general law city. " 'The powers of a general law city include " 'only those powers expressly conferred upon it by the Legislature, together with such powers as are "necessarily incident to those expressly granted or essential to the declared object and purposes of the municipal corporation." ' " ' " (*City of Orange v. San Diego County Employees Retirement Assn.* (2002) 103 Cal.App.4th 45, 52 [126 Cal.Rptr.2d 405] (*City of Orange*).) A " 'general law city . . . must comply with state statutes that specify requirements for entering into contracts. [Citations.]' "

---

[2] In considering the sale of its mobilehome parks, the City was particularly concerned with ensuring "an ownership and rent structure which maintains and enhances the quality of services" for residents. In a March 2005 memorandum to the City, the Park's five-member "Selection Panel" explained it had reviewed submissions by and interviewed the Owners Association, Wakeland and two other entities, and found Wakeland and one of the other entities more qualified to purchase, own and operate the Park. The memorandum explained that in addition to not demonstrating an ability to finance purchase of the Park, the Owners Association "did not demonstrate that it has the capacity to asset manage a 399 space mobilehome community. Asset management responsibilities for such a large project are complex. These duties include developing budgets, making decisions on spending, identifying capital replacement priorities, maintaining and overseeing the rent structure . . . , overseeing the financial and accounting systems and preparation of financial reports including audits, and providing services to residents."

(*Ibid.*) " 'A contract entered into by a local government without legal authority is "wholly void," ultra vires, and unenforceable.' " (*G. L. Mezzetta, Inc. v. City of American Canyon* (2000) 78 Cal.App.4th 1087, 1092 [93 Cal.Rptr.2d 292] (*Mezzetta*).) " '[O]ne who makes a contract with a municipal corporation is bound to take notice of limitations on its power to contract and also of the power of the particular officer or agency to make the contract.' " (*Id.* at p. 1094, fn. 4.)

Under Government Code section 40602, subdivision (b), the mayor or another officer designated by ordinance "shall sign" "[a]ll written contracts and conveyances made or entered into by the city." The word "shall" in Government Code section 40602 is mandatory. (*South Bay Senior Housing Corp. v. City of Hawthorne* (1997) 56 Cal.App.4th 1231, 1236 [66 Cal.Rptr.2d 99].) The only writing the Owners Association relies on, the minutes from the City Council's July 20, 1999 meeting, is not signed by the City's mayor and thus does not qualify as a contract.[3] Further, the minutes do not show the City promised the Owners Association anything in particular. The stated goal in divesting City-owned mobilehome parks was merely to "insure an ownership and rent structure which maintains and enhances the quality and services of these properties," and the policy was to "design a strategy which would transfer ownership to an entity such as a non-profit corporation, resident ownership/cooperative or similar structure." Neither the goal nor the policy binds the City to a particular procedure for selling the Park. Indeed, the policy anticipated the possible sale of the Park to a nonprofit corporation, which would include Wakeland. Accordingly, the court did not abuse its discretion by denying the Owners Association's motion for reconsideration and bid to file a third amended complaint to attach the writing.

Beyond that, the Owners Association's claims are based on the allegation in the second amended complaint that beginning in 1991 and on "many" occasions, unnamed members of the City Council, City Manager Bowersox, and employees of the Redevelopment Agency, including Narevsky, orally expressed an intent to "afford the tenants/residents a real, true and non-illusory opportunity" to purchase the Park. The complaint does not allege the specifics of the representations or where they took place. There is no suggestion the City ever approved such an oral agreement, or even that the issue was submitted to the City for formal consideration.

The Owners Association cites no authority to support application of the promissory estoppel doctrine based on similar alleged oral agreements. It

---

[3] In its opening brief, the Owners Association refers to "a 2003 City Council resolution adopted after several public hearings" in which it promised "that if and when the City decided to sell the [P]ark, it would include the residents in the bidding and sale process. . . ." The statement is not supported by any citation to the record.

relies on *City of Orange, supra,* 103 Cal.App.4th 45, in which the court concluded that read together the language of Government Code section 40602 and provisions of a municipal code not at issue here, "do not unambiguously require that every city contract, without exception, be in writing and signed by the mayor." (*City of Orange,* at p. 54.)

In *City of Orange,* the court considered the general purpose of Government Code section 40602, which "is to ' " 'ensure that expensive decisions are not hastily made' " ' and to create ' " 'a broad base of authority by requiring [contract] approval by a number of different individuals.' " ' " (*City of Orange, supra,* 103 Cal.App.4th at pp. 54–55.) The court held the *city* could enforce an oral option contract with the retirement association that required it to hold open its settlement offer in litigation between it and the city, as restrictions on a municipality's power to contract are designed to protect the public, not those who deal with the public. (*Id.* at p. 54.)

The court further explained the oral option contract imposed no financial burden on the city, the sole consideration was the city's agreement to stay litigation while considering the retirement association's settlement offer, and the "litigation standstill would save the city money if the offer were accepted." (*City of Orange, supra,* 103 Cal.App.4th at p. 54.) Under those circumstances, the purpose of Government Code section 40602—to prevent hasty decisions on important public matters—was served by honoring the oral option agreement because it gave the city adequate time to review the settlement offer and secure approval from city officials without fear the retirement association would withdraw the offer. (*City of Orange,* at p. 55.) "Orange had much to gain and little, if anything, to lose from the oral option contract." (*Ibid.*)

*City of Orange* is readily distinguishable on its facts. Here, in contrast to that case, private parties seek to enforce an alleged oral promise against a public entity, which is ordinarily not subject to promissory estoppel. Further, the City has little or nothing to gain and much to lose if the promissory estoppel doctrine is held to bind it to the alleged oral representations of its council members or employees. For instance, the City could not sell the Park to Wakeland, or anyone else for that matter, for the agreed price of $35.6 million, as that amount allegedly exceeds fair market value by some $10 million and thus deprives the Owners Association of a genuine opportunity to purchase the Park. Accordingly, the alleged oral agreement may place a financial burden on the City.

It is true that Government Code section 40602, standing alone, does not *expressly* require that every contract of a municipality be in writing. However, a statute prescribing a city's method for contracting may *impliedly*

prohibit any other method of contracting. (*Nash v. City of Los Angeles* (1926) 78 Cal.App. 516, 522 [248 P. 689]; see also 10A McQuillin, Municipal Corporations (3d ed. 1999) § 29.112.) In our view, Government Code section 40602 impliedly requires a written contract here, because an oral contract would violate the statute's purpose of requiring a city's governing body to make considered decisions on important matters affecting the public fisc. " ' "No single individual has absolute authority to bind the municipality; many parts of the city government must work together." ' " (*Mezzetta, supra,* 78 Cal.App.4th at p. 1094.)

The Owners Association's reliance on *Mansell, supra,* 3 Cal.3d 462, is likewise misplaced. *Mansell* involved long-standing and complicated boundary disputes that affected thousands of persons who lived in the Alamitos Bay area. Because a variety of factors "cast a cloud on the title to this land to such an extent . . . the normal procedure of removing such a cloud, by an action to quiet title, [was] of no practical value" (*id.* at p. 467), the Legislature attempted to resolve the disputes by disclaiming state and other public interests in certain tidelands and submerged lands. The city manager and the city clerk, however, refused to perform their ministerial duties to carry out the legislation on the ground it violated constitutional and common law prohibitions against the alienation of state-owned tidelands and submerged lands. The city sought a writ of mandate compelling the officers to perform their duties, and the state was the real party in interest.

Among other arguments, the city and state raised an equitable estoppel argument against *themselves.* They asserted that since "the subject lands were filled and improved with the knowledge and acquiescence of the state and city and that since annexation of the area in 1923 the city has exercised full municipal jurisdiction over it—granting building permits, approving subdivision maps, constructing and maintaining streets and city services, [and] collecting taxes," it would result in manifest injustice if they claimed paramount title. (*Mansell, supra,* 3 Cal.3d at p. 487.) The court noted the estoppel argument was not relevant to its decision (*ibid.*), but it nonetheless considered the issue and found the elements of estoppel present. (*Id.* at p. 493.)

The court explained "the activities, representations, and conduct of the state and its subtrustee the city . . . rise to the level of culpability necessary to support an equitable estoppel against them . . . . The stipulated facts clearly establish that from an early date the state and city have been aware of the serious and complex title problems in the Alamitos Bay area. More importantly, those public entities have been in a position to resolve such problems and to determine the true boundaries between public and private lands. This they have not done. Instead they have conducted themselves relative to

settled and subdivided lands . . . as if no title problems existed and have misled thousands of homeowners in the process." (*Mansell, supra*, 3 Cal.3d at p. 492.)

The *Mansell* court concluded application of the estoppel doctrine would not have a deleterious effect on the public policy of ensuring public ownership of tidelands, as development in the Alamitos Bay area "has resulted in an area providing an impressive array of public facilities for navigation and recreation." (*Mansell, supra*, 3 Cal.3d at p. 500.) The court cautioned that the estoppel issue arose in a "peculiar context" (*id.* at p. 499), "similarly compelling circumstances will not often recur" (*id.* at p. 500), and it intended to "create an extremely narrow precedent for application in future cases." (*Ibid.*)

Here, in contrast, the City did not raise the estoppel doctrine against itself, and application of the doctrine would have deleterious effects. *Mansell* and *City of Orange* are unhelpful to the Owners Association as they do not address the scenario at issue here. "A decision is authority only for the point actually passed on by the court and directly involved in the case. General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93]; see *Chevron .U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613].)

Numerous cases hold promissory estoppel may not be raised against a public entity when it would defeat the public policy of requiring adherence to statutory procedures for entering into contracts. (See, e.g., *Seymour v. State of California* (1984) 156 Cal.App.3d 200, 204 [201 Cal.Rptr. 15] [no estoppel against state based on oral lease when statute required a written lease approved by specified officer]; *State of California v. Haslett Co.* (1975) 45 Cal.App.3d 252, 257–258 [119 Cal.Rptr. 78] [estoppel could not be raised against the state to render effective an oral agreement to enter into a lease when it was not approved by the officer designated by statute]; *Santa Monica Unified Sch. Dist. v. Persh* (1970) 5 Cal.App.3d 945, 953 [85 Cal.Rptr. 463] [no estoppel against a school district when a written offer was orally affirmed but not ratified or approved by the board as required by statute].) The "doctrine of estoppel is not available to ' "defeat the effective operation of a policy adopted to protect the public." ' " (*City of Fresno v. California Highway Com.* (1981) 118 Cal.App.3d 687, 697 [173 Cal.Rptr. 671].) Likewise, we

conclude estoppel is unavailable here against the City to enforce the alleged oral contract. The court properly granted the demurrer to the first cause of action.[4]

## C

### Implied Covenant of Good Faith and Fair Dealing

"There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract. [Citations.] This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his [or her] own, but also the duty to do everything that the contract presupposes that he [or she] will do to accomplish its purpose." (*Harm v. Frasher* (1960) 181 Cal.App.2d 405, 417 [5 Cal.Rptr. 367].)

The implied covenant of good faith and fair dealing does *not* extend beyond the terms of the contract at issue. (*New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.* (1992) 7 Cal.App.4th 1088, 1096 [9 Cal.Rptr.2d 469].) In *Gibson v. Government Employees Ins. Co.* (1984) 162 Cal.App.3d 441 [208 Cal.Rptr. 511], the court sustained a demurrer because the plaintiffs did not allege the defendant "failed in any way to perform pursuant to the terms of the contract" (*id.* at p. 447), and "we have not found . . . any case which extends . . . a covenant of good faith and fair dealing . . . beyond the terms of the . . . contract in force between them." (*Id.* at p. 448.)

Civil Code section 798.80, subdivision (a), a provision of the Mobilehome Residency Law, states: "Not less than 30 days nor more than one year prior to an owner of a mobilehome park entering into a written listing agreement with a licensed real estate broker . . . for the sale of the park, or offering to sell the park to any party, the owner shall provide written notice of his or her intention to sell the mobilehome park by first-class mail or by personal delivery to the president, secretary, and treasurer of any resident organization formed by homeowners in the mobilehome park as a nonprofit corporation . . . , stock cooperative corporation, or other entity for purposes of converting the mobilehome park to condominium or stock cooperative ownership interests and for purchasing the mobilehome park from the management of the mobilehome park."

It is undisputed that the City notified the Owners Association in a timely manner of its intent to sell the Park. The second amended complaint alleged

---

[4] Given our holding, we are not required to consider the City's argument the alleged oral contract also violated the statute of frauds, or the apparent lack of any consideration to support the alleged oral contract.

the notice nonetheless violated Civil Code section 798.80, subdivision (a) because "it was a sham" in that the City had no intent to "sell the park on true, real and non-illusory terms." The notice also allegedly breached the implied covenant of good faith and fair dealing in the leases between the City and tenants of the Park since the leases incorporate the terms of the Mobilehome Residency Law.

The sample lease attached to the second amended complaint states the agreement "is intended by Lessor and Homeowner to comply with the California Mobilehome Residency Law (Sections 798 et seq. of the California Civil Code), a copy of which is attached hereto and made part hereof." Neither the lease nor Civil Code section 798.80, subdivision (a), however, required the City to offer the Park to the residents under any particular terms. Moreover, the complaint's allegation the notice the City gave was a "sham" is an unsupported conclusion of fact or law the court was not bound to accept as true. Accordingly, the court properly sustained the demurrer to the second cause of action and entered a judgment of dismissal.[5]

## II

### *The City's Action*

### A

### *Standard of Review*

██ "A public agency may upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, and for 60 days thereafter, bring an action in the superior court . . . to determine the validity of such matter. The action shall be in the nature of a proceeding in rem." (Code Civ. Proc., § 860.) "Generally speaking, statutory validation actions are designed to provide expedient, uniform procedures by which public agencies can obtain binding judgments as to the validity of public financing commitments such as 'bonds, warrants, contracts, obligations or evidence of indebtedness . . . .' " (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 66, fn. 12 [24 Cal.Rptr.3d 72]; see Gov. Code, § 53511.) " 'Assurance as to the legality of the proceedings surrounding the issuance of municipal bonds is essential before underwriters will purchase bonds for

---

[5] The Owners Association does not challenge the granting of the demurrer to the second amended complaint's third cause of action for declaratory relief. Because the promissory estoppel and breach of the implied covenant causes of action lack merit, the Owners Association is not entitled to declaratory relief.

resale to the public.' " (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842 [73 Cal.Rptr.2d 427].)

"The scope of judicial review of a legislative type activity is limited to an examination of the record before the authorized decision makers to test for sufficiency with legal requirements. [Citation.] A substantial evidence review is limited to the record before the . . . city council; it is an examination of the proceedings before the entit[y] to determine if [its] actions were arbitrary, capricious, or entirely lacking in evidentiary support. The trial court reviews the decision-making process of the administrative agency and does not conduct its own evidentiary hearing . . . ." (*Morgan v. Community Redevelopment Agency* (1991) 231 Cal.App.3d 243, 258 [284 Cal.Rptr. 745].)

On appeal, we apply the same standard of review. We examine the administrative record to determine whether substantial evidence supports the trial court's findings. (*Beach-Courchesne v. City of Diamond Bar* (2000) 80 Cal.App.4th 388, 394 [95 Cal.Rptr.2d 265].)

B

*Jurisdictional Issue*

Preliminarily, we dispose of the Owners Association's contention the trial court lacked jurisdiction over the validation action because of procedural irregularities. The validation statutes (Code Civ. Proc., § 860 et seq.) require no particular procedure. Code of Civil Procedure section 867, however, states validation actions "shall be given preference over all other civil actions before the court in the matter of setting the same for *hearing* or trial, and in hearing the same, to the end that such actions shall be speedily heard and determined." (Italics added.)

On December 1, 2005, the City appeared ex parte to obtain a hearing date and establish a briefing schedule. The court scheduled a hearing on the matter for February 24, 2006. The court also ordered that the parties file moving, opposition and reply briefs pursuant to standard law and motion requirements under Code of Civil Procedure section 1005.

On February 22, 2006, the Owners Association appeared ex parte and argued the matter should not proceed on the law and motion calendar, but should proceed as a regular trial with the presentation of evidence outside the administrative record. The court determined the matter would proceed on the law and motion calendar and the evidence would be limited to the administrative record. At the February 24 hearing, the Owners Association argued the City was actually moving for summary judgment, and because it did not

comply with the 75-day notice requirement for a summary judgment motion the court lacked jurisdiction to hear the matter.

The Owners Association cites no authority for the proposition that procedural requirements for a summary judgment motion or any other type of motion apply to a validation action. " ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation, and to have been abandoned." [Citation.]' [Citation.] Nor is an appellate court required to consider alleged error where the appellant merely complains of it without pertinent argument. [Citation.] Since [the appellant] does not address the issue, we treat it as abandoned and comment no further." (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 710–711 [152 Cal.Rptr. 65].)

### C

### *Sufficiency of the Evidence*

### 1

### *Overview of Tax-exempt Bond Financing for Low-income Housing*

### a

### *Government Projects*

██ Local agencies may issue bonds to finance government projects, and the interest on bonds is not included in bondholders' gross income for federal taxation purposes. (26 U.S.C. § 103(a).) "Interest rates on municipal bonds are lower than interest rates on conventional bonds of similar creditworthiness because the holders of municipal bonds do not pay tax on the interest received. Lower interest rates mean that municipalities have lower costs associated with building and financing government projects." (Torielli, *Opining on the 501(C)(3) Tax-Free Bond Transaction: Avoiding Common Borrower's Counsel Misconceptions* (2004) 31 Wm. Mitchell L.Rev. 147, 152, fn. omitted (Torielli).)

Under part 5 of division 31 of the Health and Safety Code (§ 52000 et seq.), a local agency may issue tax-exempt bonds to provide housing to persons with low income. The Legislature has declared "that the authority to issue revenue bonds to aid in the financing of home purchase is needed in the cities and the counties of the state and that it is in the public interest and serves a public purpose by providing financing for decent, safe, and sanitary

housing that people in the lower end of the purchasing spectrum can afford and is a function pertaining to the government and affairs of the cities and the counties of the state." (Health & Saf. Code, § 52006.)

Under Health and Safety Code section 52075, subdivision (a), a city may issue revenue bonds "for the purpose of financing the acquisition, construction, rehabilitation, refinancing, or development of multifamily rental housing." The interest on such bonds is not taxed by the state (Health & Saf. Code, § 52085) or the federal government (26 U.S.C. § 103(a)).

b

*Private Projects*

■   Local agencies may also issue bonds and loan the proceeds to private businesses to encourage certain projects. (Torielli, *supra,* 31 Wm. Mitchell L.Rev. at p. 152.) A bond is a "private activity bond" if, for instance, "more than 10 percent of the proceeds of the issue are to be used for any private business use." (26 U.S.C. § 141(b)(1).)

Under section 103(b) of the Internal Revenue Code, the interest on a private activity bond is excluded from bondholders' gross income for tax purposes only if the bond is a "qualified bond" within the meaning of section 141 of the Internal Revenue Code (26 U.S.C. § 141). The term "qualified bond" means any private activity bond that meets certain criteria, such as being "a qualified 501(c)(3) bond." (26 U.S.C. § 141(e)(1)(G).) Under section 501(c)(3) of the Internal Revenue Code, a corporation organized and operated exclusively for charitable purposes is exempt from federal income taxation. (26 U.S.C. § 501(c)(3).)

Part 5 of division 31 of the Health and Safety Code (§ 52000 et seq.) also applies to governmental financing of the provision of low-income housing by the private sector. Health and Safety Code section 52100 states: "The Legislature hereby finds and declares that it would be beneficial to empower counties and cities to issue tax-exempt revenue bonds for the purpose of lending the proceeds to nonprofit organizations exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986, as amended . . . , for the housing purposes specified in Section 52101."

■   Health and Safety Code section 52101 allows a city to issue bonds and loan the proceeds to a tax-exempt charitable corporation for a variety of purposes, including the acquisition of mobilehome parks "that are or will be nonprofit or cooperatively-owned." Issuance of the bonds must satisfy section 145 of the Internal Revenue Code.

Under section 145 of the Internal Revenue Code, a bond shall not be a "qualified 501(c)(3) bond if any portion of the net proceeds of the issue are to be used directly or indirectly to provide residential rental property for family units." (26 U.S.C. § 145(d)(1).) An exception to that rule exists, however, for "qualified residential rental projects" as defined in 26 United States Code section 142(d). (26 U.S.C. § 145(d)(2)(B).) A project is a "qualified residential rental project" if, "at all times during the qualified project period," "20 percent or more of the residential units in such project are occupied by individuals whose income is 50 percent or less of area median gross income." (26 U.S.C. § 142(d)(1)(A).)

Under TEFRA, a private activity bond shall not be a qualified bond absent public approval, meaning "after a public hearing following reasonable public notice" or approval by public referendum. (26 U.S.C. § 147(f)(2)(B)(i).) This requirement focuses "on the democratic nature of the approval-granting authority: it is either the electorate as a whole or persons chosen by the electorate" who approve the bonds. (*Affordable Housing v. City of Fresno* (9th Cir. 2006) 433 F.3d 1182, 1193 (*Affordable Housing*).)

2

*TEFRA Hearing*

The City noticed a TEFRA hearing under 26 United States Code section 147(f) for June 14, 2005. At the hearing, the City adopted resolutions approving its sale of the Park to the Redevelopment Agency (resolution No. 05-044), and its issuance of revenue bonds to finance the Redevelopment Agency's purchase and allow the City to retire and refinance debt associated with the Park (resolution No. 05-043). The Redevelopment Agency adopted resolutions approving its purchase of the Park and an operating agreement between it and Wakeland (resolution No. R-05-06), and requesting that the City issue the revenue bonds (resolution No. R-05-05).

The Owners Association contends the judgment in the validation action was improper because the City presented no evidence at the TEFRA hearing that Wakeland or its subsidiary qualified as a tax-exempt charitable corporation under 26 United States Code section 501(c)(3), or that the Park satisfied the 20-50 rule pertaining to the provision of low-income housing.[6]

The City concedes that at the time of the hearing, PRE's approval from the IRS was pending. The City asserts PRE's tax-exempt status was not a

---

[6] We deny the City's requests that we take judicial notice of a July 28, 2006 letter from the IRS to Wakeland pertaining to the tax-exempt status of PRE, as the matter was not before the trial court and is not relevant to our opinion. We grant the Owners Association's motions to strike the portions of the City's supplemental briefs that refer to the letter.

prerequisite of the hearing, because the sale of the Park was contingent on it receiving approval from the IRS, and if it did not get approval the Redevelopment Agency could not sell the Park to PRE.

The City also asserts it was not required to present any evidence that 20 percent of the Park's spaces would be available for low-income housing because the mobilehome park sale and operating agreement (Agreement) between the Redevelopment Agency and PRE provides: "Purchaser shall restrict occupancy of not fewer than twenty percent . . . of the Mobilehome Spaces to Very Low Income Households . . . and not fewer than an additional forty percent . . . of the Mobilehome Spaces to Lower Income Households. . . . The Purchaser shall annually submit to Agency a summary of the income, household size and rent payable by each of the residents of the Affordable Spaces who provide income certificates to Purchaser." The Agreement includes provisions on establishing maximum monthly rentals for low-income spaces based on 50 percent of the San Diego County median income for relevant family sizes.

Preliminarily, we note the City's bond resolution is misleading as to the authority for its issuance of tax-exempt bonds. The resolution's preamble states "the Agency intends to, but is not obligated to, sell the Park to [Wakeland], a non-profit corporation . . . , or an entity formed by Wakeland, provided that it will not sell the Park absent an opinion of nationally recognized bond counsel that the exclusion from gross income of interest on the Bonds will not be adversely affected for federal income tax purposes as a consequence of such sale, and therefore *the Bonds are being issued as qualified 501(c)(3) bonds pursuant to the Internal Revenue Code.*" (Italics added.)

The resolution's preamble also states that "pursuant to Section 147(f) of [26 United States] Code, the issuance of the Bonds is required to be approved, following a public [TEFRA] hearing, by an elected representative of the issuer of the Bonds and an elected representative of the governmental unit having jurisdiction over the area in which the Park is located." As discussed, a TEFRA hearing is required when revenue bonds are issued to finance the project of a tax-exempt charitable corporation.

Further, the section of the resolution entitled "Approval of Issuance of Bonds" states the issuance "is hereby authorized and approved pursuant to *Chapter 8* of Part 5 of Division 31 of the Health and Safety Code and Section 147(f) of the [Internal Revenue] Code. It is the purpose and intent of this City Council that this resolution constitute approval of the issuance of the Bonds by the applicable elected representative of the governmental unit having jurisdiction over the area in which the Project is located, all in accordance

with Section 147(f) of the [Internal Revenue] Code." (Italics added.) Chapter 8 begins with Health and Safety Code section 52100 and pertains to loans to tax-exempt charitable organizations under 26 United States Code section 501(c)(3).

Additionally, in its respondent's brief on appeal, the City states the bonds would be issued "as 'qualified 501(c)(3) bonds' under the [Internal Revenue] Code."

Under the first step of the City's plan, however, it intended to issue the bonds and loan the proceeds to the Redevelopment Agency, which is not a charitable corporation under 26 United States Code section 501(c)(3). We requested supplemental briefing from the parties on this and other issues, and the City *now* advises that the authority for its issuance of tax-exempt bonds and loan of the proceeds to the Redevelopment Agency for its purchase of the Park is *actually* Health and Safety Code section 52075, subdivision (a), discussed above. The City states that if PRE did not qualify for tax-exempt status, step two of its plan would not occur and the Redevelopment Agency would continue as the Park's owner and the bonds would remain tax exempt under 26 United States Code section 103(a). If PRE did qualify as tax exempt, borrow the bond proceeds and purchase the Park, the bonds would remain tax exempt, but under 26 United States Code 501(c)(3).

The City explains that to take advantage of favorable interest rates and retire existing debt on the Park, it sought to issue tax-exempt bonds before Wakeland or PRE obtained a determination letter from the IRS. For reasons not satisfactorily explained, the City did not refinance the debt itself. Rather, it decided to first loan the proceeds of the bond issuance to the Redevelopment Agency for its interim purchase of the Park.

The City asserts: "The City and [Redevelopment] Agency proceeded in a conservative fashion so as to assure that the bonds would qualify as tax exempt bonds under two possible scenarios: If the City was not able to proceed with a qualified 501(c)(3) borrowing, which is the structure that requires the TEFRA hearing, the City would still move forward with a 'refunding' of the prior debt, all of which will result in significant savings to the City. Consequently, if there is . . . any tax issue, such as not receiving the IRS determination letter, the sale to PRE would not move forward and the [Redevelopment] Agency would maintain ownership of the Park. Conversely, in the event that 501(c)(3) requirements were satisfied and the Park could be sold to PRE, the City and the [Redevelopment] Agency have *already*

*complied with the requirements of TEFRA,* thus not delaying the issuance of the bonds and the resulting savings."[7] (Italics added.)

The City concedes the bond resolution does not state the specific authorization for step one of its plan, issuance of tax-exempt bonds and loan of the proceeds to the Redevelopment Agency. It submits, however, that under Health and Safety Code section 52031 it was only required to generally cite part 5 of division 31 of that code, which also includes section 52075.[8] Although the resolution specifically cites *chapter 8* of part 5, the City asserts its authority to cite only part 5 is not "invalidated by reference to a different chapter within the part."

The City also advises that "TEFRA compliance, and the TEFRA reference in the [b]ond [r]esolution, were included solely and exclusively to accommodate Step 2, the subsequent sale to the Park by the [Redevelopment] Agency, and were not intended to relate to Step 1, the sale of the Park to the [Redevelopment] Agency. The Resolution was drafted, and the related proceedings undertaken, to provide complete authority for both steps of the financing." Again, however, the City concedes the resolution does not set forth the specific authority for its issuance of tax-exempt bonds and loan of the proceeds to the Redevelopment Agency.

Despite the City's attempts to defend the bond resolution, a reader can only conclude from its language that the City intended to do an unauthorized act: issue tax-exempt bonds under *chapter 8* of part 5 of division 31 of the Health and Safety Code, which pertains to tax-exempt charitable corporations under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3)), and loan the proceeds to the Redevelopment Agency, which does not qualify as such an organization. Since the resolution referred specifically to *chapter 8* of part 5 of division 31 of the Health and Safety Code and sections 147(f) and 501(c)(3) of the Internal Revenue Code, we question why it did not set forth

---

[7] This statement muddies the waters, as it suggests the City did not intend to issue the bonds until PRE received tax-exempt status. The City has explained numerous times, however, that it intended to issue the bonds and loan the proceeds to the Redevelopment Agency notwithstanding PRE's status. It is unclear how holding a second hearing to comply with TEFRA after PRE received IRS approval would delay issuance of the bonds.

[8] Health and Safety Code section 52031 provides: "The exercise of any or all powers granted by this part shall be authorized and the bonds shall be authorized to be issued under this part for the purposes set forth in this part, by resolution or ordinance of the governing body of the city or county which shall take effect immediately upon adoption. Any such resolution or ordinance shall set forth a finding ·and declaration (1) of the public purpose therefor and (2) that such resolution or ordinance is being adopted pursuant to the powers granted by this part. The finding and declaration shall be conclusive evidence of the existence and sufficiency of the public purpose and powers."

the authority for the first step of the City's plan, which members of the public could not reasonably be expected to know was unrelated to PRE's status as a tax-exempt entity.

With the City's *actual* financing plan in mind, we must determine whether the hearing was a sufficient TEFRA hearing to satisfy the second step of the City's plan. The statute does not set forth any procedural requirements other than approval by voter referendum or the governmental unit following reasonable public notice. (26 U.S.C. § 147(f)(2)(B).) Further, there is a dearth of reported opinions citing the statute.

The Owners Association cites *Steele v. Industrial Development Bd. of Metro* (6th Cir. 2002) 301 F.3d 401 (*Steele*), for the proposition TEFRA "contemplates public approval by a governmental unit based upon evidence available at the public hearing that the IRS requirements have been satisfied." The issue in *Steele* was whether the development board should have issued tax-exempt bonds for the benefit of a private religious university. In reciting the background, the court noted without discussion that to be qualified as tax exempt, the bonds had to meet certain criteria, including that the university be "a registered 501(c)(3) organization." (*Steele, supra,* at pp. 404–405.)

In *Affordable Housing, supra,* 433 F.3d at page 1193, the court explained the "federal focus is on the democratic nature of the approval-granting authority: it is either the electorate as a whole or persons chosen by the electorate." The court elaborated that "TEFRA mandates that the city council decide the matter [at issue] *after considering local residents' views,* and by clear implication requires the city council to consider city priorities and housing needs, the wisdom of preferential financing for the project, and *all manner of other relevant considerations to which elected representatives normally give weight in executing their office.*" (*Id.* at p. 1195, italics added.) The court also explained that "the federal statute's explicit provisions for a voter referendum or approval by an elected representative indicate that Congress did not intend to make approval automatic or to exclude the play of *democratic process* in the local decision." (*Id.* at p. 1194, italics added.)

Ignoring *Affordable Housing, supra,* 433 F.3d 1182, the City asserts "[t]here is nothing in Internal Revenue Code section 147(f) which even raises the inference that a 'democratic process' is required or that evidence must be taken and findings have to be made with respect to the proposed 501(c)(3) corporation." We reject the notion a democratic process is not required, because that is the purpose of the hearing requirement. Further, while 26 United States Code section 147(f) does not explicitly state a corporation must have achieved tax-exempt status by the time of the TEFRA hearing, that requirement is implicit. Indeed, the purpose of a TEFRA hearing is for a local

entity's public consideration of whether to issue private activity bonds to finance a project of a charitable corporation under 26 United States Code section 501(c)(3). Here, it appears that in a rush to take advantage of favorable interest rates, laudable in and of itself, the City put the cart before the horse.

We also conclude the hearing did not give the public an adequate opportunity to comment on the matter of low-income housing, the provision of which is the *purpose* of financing the private project with tax-exempt bonds. Again, a bond is not a "qualified 501(c)(3) bond" if any portion of the net proceeds of the issue are to be used for residential rental property (26 U.S.C. § 145(d)(1)), unless "20 percent or more of the residential units in such project are occupied by individuals whose income is 50 percent or less of area median gross income." (26 U.S.C. § 142(d)(1)(A).)

As explained in *Affordable Housing, supra*, 433 F.3d 1182 under TEFRA approval of tax-exempt bonds is subject to community input, and in making its decision the City is required to consider such input. The City points to no evidence in the administrative record that it brought forth or discussed any information on the provision of low-income housing at the Park, a critical element in maintenance of the tax-free status of the bonds. We disagree that the Agreement between the Redevelopment Agency and PRE satisfied TEFRA because it includes provisions requiring PRE to comply with the 20-50 rule. We conclude that given the contingent nature of step two of the City's divestiture plan, the uncertain status of Wakeland or PRE at the time of the hearing, and the lack of any information on the low-income aspect of the project, the City's hearing was essentially tantamount to no TEFRA hearing at all.[9],[10]

---

[9] A public agency may issue "industrial development bonds" (IDB's) but, as with private activity bonds, they do not qualify for tax-exempt status unless a public approval process was satisfied before their issuance. A temporary income tax regulation sets forth the requirements of the process for IDB's, and provides, "Public hearing means a forum providing a *reasonable opportunity for interested individuals to express their views*, both orally and in writing, on the proposed issue of bonds and the location and nature of a proposed facility to be financed." (26 C.F.R. § 5f.103-2(g)(2) (2007), italics added.) There is currently no regulation pertaining to the public hearing requirement for private activity bonds, but by analogy, the regulation for IDB's is instructive. With the contingent nature of PRE's purchase of the Park, and the lack of any information on the 20-50 rule, the public had no reasonable opportunity to express its views on significant matters.

[10] Given our conclusion that TEFRA was unsatisfied, we are not required to consider the Owners Association's contention that the City was not legally authorized to sell the Park to the Redevelopment Agency because there was no evidence the Park is within a redevelopment zone.

## DISPOSITION

The judgment on the Owners Association's action is affirmed. The judgment on the City's validation action is reversed. The parties are to bear their own costs on appeal.

Haller, J., and Irion, J., concurred.