Filed 2/21/17

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| GOLDEN DAY SCHOOLS, INC., | B261461 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS142234) |
| v. | |
| OFFICE OF ADMINISTRATIVE HEARINGS, | |
| Respondent; | |
| CALIFORNIA DEPARTMENT OF EDUCATION, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge. Affirmed in part and reversed in part.

Doll Amir & Eley, Gregory L. Doll and Lloyd Vu for Plaintiff and Appellant.

No appearance for Respondent.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Ismael A. Castro, and Lisa A. Tillman, Deputy Attorneys General, for Real Party in Interest and Appellant.

————————————————

This appeal and cross-appeal arise out of the trial court's ruling on a petition for writ of administrative mandamus pursuant to California Code of Civil Procedure section 1094.5. In its appeal, Golden Day Schools, Inc. (Golden Day) contends the trial court erroneously upheld certain findings of the Administrative Law Judge (ALJ), which entitled the California Department of Education (Department) to recoup more than $3 million. In its cross-appeal, the Department contends the trial court erroneously overturned one of the ALJ findings.

We conclude the Department was permitted under Education Code section 8448, subdivision (h) to conduct its own contract performance audit despite having accepted and closed Golden Day's independent financial and compliance audits. We also conclude substantial evidence supports the findings of the ALJ and the trial court that the Department was allowed to recoup (i) costs for commingling eligible and noneligible students, (ii) certain payroll costs for employees who also worked at a charter school on some of the same sites, and (iii) various nonreimbursable costs (the Department's Findings Nos. 2, 4, 6).

**FACTUAL AND PROCEDURAL BACKGROUND**

**The Parties**

Golden Day is a nonprofit corporation founded by Clark Parker that has provided children from low-income families with daycare, education, and social development since 1968. Its schools are located at several sites throughout Los Angeles. The sites are owned by Clark Parker and his wife, Jeanette Parker (collectively the Parkers). The Parkers lease these sites to Golden Day, which in turn subleases four classrooms to Today's Fresh Start Charter School (Today's Fresh Start), a charter school founded in 2003 and operated by Jeanette Parker. Unlike Golden Day, Today's Fresh Start is

2

authorized and overseen by the Los Angeles County Office of Education. Both Parkers are members of Golden Day's board of directors.

The Department is the designated state agency responsible for implementing the Child Care and Development Services Act (Ed. Code, § 8200 et seq.). (*Golden Day Schools, Inc. v. Department of Education* (1999) 69 Cal.App.4th 681, 685.) The Department is therefore responsible for the "promotion, development, and provision of care of children in the absence of their parents during the workday or while engaged in other activities which require assistance of a third party or parties." (Ed. Code, § 8206, subd. (a).)

**The Parties' Relationship**

Beginning around 1971, Golden Day began contracting with the Department to receive funds necessary to provide childcare services to eligible children in impoverished areas of South Central Los Angeles. The two contracts at issue here involve the fiscal/school years of 2006-2007 and 2007-2008. Under these contracts, the Department advanced to Golden Day $4,324,098 for fiscal year 2006-2007 and $4,519,980 for fiscal year 2007-2008. Golden Day agreed to abide by the "Funding Terms and Conditions" incorporated into the contracts, which, in turn, incorporated applicable statutory and regulatory provisions.

**Golden Day's Audits**

For each of the two years under review here, Golden Day submitted to the Department an annual "financial and compliance audit" as required by Education Code section 8448, subdivision (g). As required, the audits were performed by an independent licensed certified public accountant. (Ed. Code, § 8448, subd. (g).) The audits represented that Golden Day's financial statements were in conformity with generally accepted accounting practices, and included Golden Day's revenues and expenses for both the 2006-2007 and

3

the 2007-2008 school years.  The Department informed Golden Day that its audit reports met the Department's reporting requirements and deemed the contracts closed for both fiscal years.

**The Department's Audit**

In 2008, the Department conducted a performance review of Golden Day, termed the "Limited Scope Review," building upon Golden Day's audits, for the purpose of "determining whether Golden Day operated the child care and development programs in compliance with applicable laws, regulations, and agreement terms and conditions for the period July 1, 2006 through June 30, 2008."  The review was prompted by the Department's concerns over the validity of parent employment records necessary to establish eligibility for funding.  The review consisted of the Department's representatives visiting Golden Day's sites, interviewing employees and staff, and examining nearly all of Golden Day's business records, including inventory, payroll, invoices, receipts, checks, student sign-in sheets, time cards and journal entries.

At the end of the process, the Department notified Golden Day of its conclusion that "Golden Day failed to meet the minimum contractual requirements for compliance, did not have effective internal controls over its fiscal and program operations, and charged a significant amount of non-reimbursable and unallowable expenditures to the child development program."  The Department made nine specific findings (Findings) regarding various issues and sought to recoup $3,257,732 for the period between July 1, 2006, and June 30, 2008.  Golden Day disputed the propriety of the review itself, and further disputed the merits of the Department's Findings.

4

**Procedural History**

Golden Day appealed the Department's Findings to the Office of Administrative Hearings. Golden Day moved to dismiss the Department's Findings on the ground the Department was barred from conducting its own review after accepting Golden Day's independent financial and compliance audits. After an expedited evidentiary hearing, the ALJ denied the motion, and also denied Golden Day's motion for reconsideration. The matter proceeded to trial. Following a two-week trial during which thousands of documents were admitted, the ALJ issued its final decision, overturning some of the Department's Findings and sustaining others.

The case was then brought before the trial court by way of a petition for administrative writ of mandamus, filed by Golden Day. The trial court denied the petition with the exception of one issue.

Golden Day filed this appeal and the Department filed a cross-appeal.

## DISCUSSION

In its appeal, Golden Day argues that the Department's own performance review seeking to recoup more than $3 million after the Department had accepted Golden Day's independent financial and compliance audit is barred by Education Code section 8448 and title 5 of the California Code of Regulations section 18072. Alternatively, Golden Day challenges three specific Findings upheld by the trial court: The disallowance of 17,793 days of service due to commingling of eligible and noneligible students (Finding No. 2); the disallowance of salaries totaling $930,657 due to teachers' overlapping work schedules with Today's Fresh Start (Finding No. 4); and the disallowance of over $400,000 in various expenditures (Finding No. 6).

5

In its cross-appeal, the Department challenges the trial court's reversal of the ALJ's decision to uphold the disallowance of certain rental payments (Finding No. 5).

## Standard of Review

Where no fundamental vested right is involved, the reviewing court, like the trial court, reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them. (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058.) "Even though the fundamental vested right determination is made on a case-by-case basis, as a general rule, when a case involves or affects purely economic interests, courts are far less likely to find a right to be of the fundamental vested character." (*Id*. at p. 1060.) The trial court properly applied the substantial evidence review. (*Pacific Coast Medical Enterprises v. Department of Benefit Payments* (1983) 140 Cal.App.3d 197, 207–208 [No vested right to particular cost reimbursement from government agency].) Of course, "pure issues of law are always subject to independent appellate court review." (*Id*. at p. 1058, fn. 11.)

## The Appeal

### I. *The Department's Audit Was Not Barred*

Golden Day's first argument is a legal one—whether the Department was precluded by statute, regulation or contract from conducting its own audit after accepting Golden Day's independent financial and compliance audits. We conclude the answer is no.

#### A. *Statutory Authority*

The trial court and the ALJ properly construed Education Code section 8448, and the accompanying regulations, liberally, "with a view to effect its

6

objects and to promote justice." (Ed. Code, § 2; *In re Richards* (1993) 16 Cal.App.4th 93, 97–98 [same rules of construction govern both statutes and administrative regulations].) The "objective in interpreting a statute is to determine legislative intent so as to effectuate the law's purpose." (*Schnyder v. State Bd. of Equalization* (2002) 101 Cal.App.4th 538, 545.) "If the meaning of the words is clear, then the language controls;" if not, then "various interpretive aids," such as the statutory context and framework, and legislative history, may be used. (*Ibid*; *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist*. (1992) 8 Cal.App.4th 1554, 1562.)

By its plain language, Education Code section 8448 distinguishes the financial and compliance audits submitted by Golden Day from the Limited Scope Review conducted by the Department. The statute directs any organization receiving funds from the state under a direct service contract to provide on an annual basis a "single independent financial and compliance audit" prepared by an independent auditor. (Ed. Code, § 8448, subd. (g).) A "financial and compliance audit" is defined as a "systematic review or appraisal to determine each of the following: [¶] . . . whether the financial statements of an audited organization fairly present the financial position and the results of financial operations in accordance with generally accepted accounting principles" and "[w]hether the organization has complied with laws and regulations that may have a material effect upon the financial statements." (Ed. Code, § 8448, subd. (a)(1), (2).) The financial and compliance audit "shall include an evaluation of the accounting and control systems of the direct service contractor and of the activities by the contractor to comply with the financial requirements of direct service contracts received by the contractor from the state agency." (Ed. Code, § 8448, subd. (g).) Such

independent financial audits are "audits of the contractor rather than audits of individual contracts or programs." (*Ibid.*)

Three times the statute states that the Department's authority to conduct its own audit is separate and apart from the financial audit submitted by the contractor:

"(1) Nothing in this article limits the authority of the State Department of Education to make audits of direct service contracts. However, if independent audits arranged for by direct service contractors meet generally accepted auditing standards, the State Department of Education shall rely on those audits and any additional audit work shall build upon the work already done.

"(2) Nothing in this article precludes the state from conducting, or contracting for the conduct of, contract performance audits which are not financial and compliance audits.

"(3) Nothing in this article limits the state's responsibility or authority to enforce state law or regulations, procedures, or reporting requirements arising pursuant thereto." (Ed. Code, § 8448, subd. (h)(1)-(3).)

Despite this clear language, Golden Day argues that the Department is precluded from conducting an additional audit that seeks to recoup advanced funds after approving and accepting Golden Day's financial and compliance audits. Golden Day relies on the statutory language that "if independent audits arranged for by direct service contractors meet generally accepted auditing standards, the State Department of Education shall rely on those audits and any additional audit work shall build upon the work already done." (Ed. Code, § 4884, subd. (h)(1).) According to Golden Day, there is no purpose in mandating the Department to rely on the previous financial audit if the Department is allowed to reach behind the audit and come up with new

8

numbers.  But as discussed in *Golden Day Schools, Inc. v. Department of Education, supra,* 69 Cal.App.4th at page 690, the statute allows the Department "to perform contract-specific audits as long as they build upon financial and compliance audits prepared on behalf of the contractor which meet generally accepted auditing standards."  (*Ibid*.)  "[T]he only activity [Education Code] section 8448 precludes is a 'financial and compliance audit,' i.e., 'a systematic review or appraisal' designed to determine if the organization's financial statements accurately reflect its overall financial position.  ([Ed. Code,] § 8448, subd. (a).)"  (*Id.* at p. 691.)

The Department's audit was not done for the purpose of determining whether Golden Day's financial statements accurately reflected its overall financial position.  Rather, the purpose of the Limited Scope Review was to determine if Golden Day was operating in compliance with applicable laws, regulations, and contract terms and conditions.  Indeed, performance audits by the Department are necessary because the Department must "[p]rovide for a contract monitoring system to ensure that agencies expend funds received pursuant to this chapter in accordance with the provisions of their contracts." (Ed. Code, § 8261, subd. (a)(2).)  Permitting the Department to conduct an audit after accepting Golden Day's independent financial and compliance audits comports with the Department's own statutory obligations.

The Department's authority to conduct its own performance audit also conforms to federal law.  The Department receives federal funding under the "Child Care and Development Fund."  (Ed. Code, § 8261, subd. (d)(2); 46 C.F.R. 98.2)  The Department's receipt of federal funding depends upon periodic audits of contractor's performance to ensure that federal dollars are properly expended according to federal requirements and to monitor against improper payments.  Any improper payments render the Department subject

9

to audits and disallowance of federal funding. (45 C.F.R. § 98.66, subd. (a).) Accordingly, the Department's contract performance audit, as a component of the contract monitoring system, is integral to its continued receipt of federal funds.

Thus, we interpret Education Code section 8448 to allow the Department to conduct a performance audit of a contractor even after the Department has accepted and closed the contractor's independent financial and compliance audit.

### B. *Regulatory Authority*

Golden Day argues that because the Department accepted and closed Golden Day's financial and compliance audits for the two years in question, the Department is precluded from seeking any further reimbursement under section 18072 of title 5 of the California Code of Regulations (section 18072). This regulation provides: "The California Department of Education Office of External Audits shall conduct a review of the audit to determine whether the audit is acceptable and to determine the contractor's net reimbursable program costs. The Office of External Audits' determination of earnings shall be the final accounting of any amount payable to or receivable from the contractor pursuant to the contract." (§ 18072, subd. (a).) The contractor may appeal the Office of External Audits' findings. (§ 18072, subd. (b).)

Unlike Golden Day, we do not interpret section 18072 to bar the Department from recouping improperly advanced funds. First, a regulation cannot alter or amend a statute. (*California School Bds. Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 544.) Under Education Code section 8448, subdivision (h), the Department has the overarching authority to "enforce regulations, procedures or reporting requirements."

10

Second, section 18072's discussion of the finality of a financial audit can be harmonized with the statutory scheme and other regulations. A contracting agency's independent financial audit is a limited review—the Department merely reviews the submitted financial statements and closes the audit upon confirming that the independent auditor's report states that the financial statements were made in accordance with generally accepted accounting principles and accurately reflect the contractor's financial position. As noted by the trial court, there is no onsite visit by any Department personnel or anything more than a paper review. By contrast, Education Code section 8448 allows the Department to go well beyond a paper review after acceptance of a contractor's financial audit, by conducting an additional audit "buil[t] upon" the financial audit (Ed. Code, § 8448, subd. (h)(1)) or by a contract performance audit that does not involve a financial and compliance audit (Ed. Code, § 8448, subd. (h)(2)); see also Cal. Code Regs., tit. 5, § 18023, subd. (a) ["'Compliance review' means that a team of California Department of Education staff reviews a contractor's program at the program site to determine compliance with applicable laws, regulations, or contractual provisions"].)

Contrary to Golden Day's assertion, the term "final accounting" in section 18072 does not preclude recoupment by the Department. Section 18038 of title 5 of the California Code of Regulations specifically requires the Department to "recoup any payments made for costs which were not reasonable and necessary." Golden Day asserts that recoupment is not a remedy mentioned in any statute and that the penalty for fraud, misuse or misappropriation of funds is immediate termination of the contract under Education Code section 8406.7 But this statute states that a contracting agency "may" have its contract terminated immediately, and it does not

11

prevent the Department from recouping advanced funds that were improperly used.

We agree with the trial court that "[a]n interpretation of section 18072 to bar a performance audit that seeks to recoup monies improperly advanced to the contractor would be inconsistent with the federal law, the state statutory scheme, and the regulations themselves."

### C. Contractual Authority

Further, the contracts between Golden Day and the Department implement the statutory scheme by requiring Golden Day to submit to the Department an acceptable annual "financial and compliance audit" of its financial position which is "performed by" a "Certified Public Accountant." The Department reviews the audit "to determine whether the audit is acceptable and to determine the contractor's net reimbursable program costs." The contracts specify that the Department must conduct a compliance review of the child development contractor at "least once every three (3) years and as resources permit," at "the contractor's office(s) and operating facility(ies) to determine the contractor's compliance with applicable laws, regulations or contractual provisions." (See also Cal. Code Regs., tit. 5, § 18023, subd. (b).) Golden Day points to nothing in the contracts that precludes the Department from conducting its own contract performance audit.

### D. Estoppel

Golden Day argues the Department should be estoped from trying to recoup funds after the Department accepted and closed Golden Day's annual financial and compliance audits, because Golden Day relied on these closures to spend the advanced funds. Golden Day asserts this reliance was reasonable because in the past the Department refused to accept or close

12

Golden Day's audits when the Department contested the audit findings.  The trial court rejected this argument and so do we.

"The essence of an estoppel is that one has, by false statements or conduct, led another to do that which he would not otherwise have done and as a result the other has suffered injury.  [Citation.]  The elements of an estoppel claim are:  '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.'" (*Golden Day School, Inc. v. Department of Education, supra*, 69 Cal.App.4th at pp. 692–693, quoting *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305.)  "Where the defendant is a government entity, a fifth element requires that the injury to the plaintiff's personal interest if the government is not estopped outweighs the injury to the public interest if the government is estopped.  [Citation.]" (*Golden Day School, Inc. v. Department of Education, supra*, at p. 693.)  Estoppel will not be applied against a government agency "if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public.'" (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 399; *City of Fresno v. California Highway Com.* (1981) 118 Cal.App.3d 687, 697.)

Golden Day cannot meet the elements of estoppel.  Golden Day was on notice from the statutory scheme, as well as the language in its own contracts, that the Department could conduct a performance audit despite the open or closed status of the financial and compliance audit.  (See *Torres v. City of Montebello* (2015) 234 Cal.App.4th 382, 399–400 [A party who contracts with the government is bound to know the law regarding the government's authority to act].)  "[E]stoppel may not be invoked where the

13

procedure specified in a statute . . . is the measure of the power to act." (*County of San Diego v. Cal. Water Etc. Co.* (1947) 30 Cal.2d 817, 825.) Thus, Golden Day could not have detrimentally relied on the Department's acceptance of Golden Day's financial and compliance audits and its closure of the contracts.

Moreover, applying estoppel here would nullify the Department's obligation to recoup advanced funds improperly used, when the source of those funds was federal and/or state monies, and the purpose of the advanced funds was to provide childcare and development to eligible children under a statutory framework.

## II.  Recoupment of Advanced Funds

"The State Department of Education shall recoup any payments made for costs which were not reasonable and necessary.  The amount that is recouped shall be the excess payment over the reasonable or fair market value, or one hundred percent (100%) of the cost, if the cost was not necessary." (Cal. Code Regs., tit. 5, § 18038, subd. (a).)  This regulation is incorporated into the parties' contracts.

Before addressing the specific items of recoupment, Golden Day argues that both the ALJ and the trial court erred in assigning it with the burden of proof.  We find no error.

Section 18067, subdivision (b) of title 5 of the California Code of Regulations provides that "Claims for reimbursement shall not be paid unless there are documents to support the claims.  The contractor has the burden of supporting claims for reimbursement."  This regulation is incorporated into the parties' contracts.  Golden Day makes much of the fact that this regulation is entitled "General Recordkeeping Requirements" to argue that it has nothing to do with the burden of proof at an administrative hearing.

14

Golden Day also argues that to saddle it with the burden of proof in a "malfeasance" action is punitive and the Department therefore should bear the burden. We do not see it that way. The recoupment of funds advanced by a government agency for services to be rendered in accordance with laws, regulations and the parties' own contracts is not a punishment. Recoupment is necessary for government agencies to recover funds that contractors were not entitled to expend. Recoupment "is, instead, a necessary means to enable the contracting governmental agency to deal with irresponsible bidders and contractors, and to administer its duties with efficiency." (*Golden Day Schools, Inc. v. State Dept. of Education* (2000) 83 Cal.App.4th 695, 704 [discussing disbarment and finding it nonpunitive].)

### A. Commingling Child Care Services (Finding No. 2)

As the trial court noted, the basis of the child development contracts is that contract funds be spent on reimbursable costs for eligible (also called certified, reimbursable or subsidized) children. Noncertified children are those who are funded by a source other than the contracts, such as a parent's private payments. Any child who is determined during an audit to be ineligible for subsidized services must be treated as noncertified. "'Commingled child care services' means the provision of services to both subsidized and nonsubsidized children in the same classroom at the same time." (Cal. Code Regs., tit. 5, § 18013, subd. (i).) Contracting entities are required to report all services, revenues and expenditures for both subsidized and nonsubsidized children if they are commingled. (Cal. Code Regs., tit. 5, § 18068, subd. (a)(3).) If a program includes noncertified children, program costs must be allocated between subsidized and nonsubsidized children on a prorated basis. For the two years at issue here, Golden Day reported that it

15

did not have any noncertified children, which meant that the Department was essentially paying for all of its operating costs.

In Finding No. 2, the Department identified nonsubsidized children attending the child development program at Golden Day, who were commingled with subsidized children, and discovered that the cost of serving them had been charged to the Department. Based on its review, the Department "determined that Golden Day should have reported a total of 17,793 days of enrollment for non-subsidized children during the period July 1, 2007 through June 30, 2008," and disallowed payment for these days.

The ALJ noted that the Department based Finding No. 2 on Golden Day's sign in/out sheets; a June 2008 field visit during which auditors identified the nonsubsidized children "by looking at the sign in/out sheets; conducting a head count; reviewing the eligibility documents in Golden Day's family files"; Golden Day's representation in its financial audit that it had no noncertified children enrolled in the reimbursable program; and the failure to provide information identifying children of Today's Fresh Start.[1] While the Parkers denied commingling of children, the ALJ concluded that Golden Day failed to meet its burden of showing there was no commingling. The trial court agreed with the ALJ.

---

[1] Golden Day complains that the ALJ's original decision identified the field visit as taking place in October 2008, past the review period, and that the June 2008 date is only found in the ALJ's corrected decision, which was untimely under Government Code section 11521 ("The power to order a reconsideration shall expire 30 days after the delivery or mailing of a decision to a respondent"). The trial court agreed that the corrected decision was untimely, but noted that because Golden Day agreed that the two decisions are substantively the same and that Golden Day itself referred to the corrected decision, which merely conforms to the evidence presented, the trial court would analyze the corrected decision. This was not error.

16

Golden Day contends that Finding No. 2 is unsupported by any evidence. It argues that because it and Today's Fresh Start both operated on the same properties and used the "***same site-wide***" sign in/out sheets, the sheets do not evidence commingling because they show nothing about the actual classroom composition of the students who signed in at a particular site. The trial court agreed that this argument, standing alone, was true, but noted that it was not the only evidence presented to the ALJ. There was evidence before the ALJ that auditors from the Department made a field visit in which subsidized and nonsubsidized students were observed in Golden Day's classrooms, and that family files showed a number of children were ineligible because their family files were missing a parent signature.

Golden Day's emphasis on the fact that it and Today's Fresh Start used the same site-wide sign in/out sheets begs the question of why each school did not have its own separate sheets, given that each school is funded by different programs. Golden Day also complains that the Department's request for enrollment records of Today's Fresh Start was unfair, because that school is not part of Golden Day. The trial court had little sympathy for this argument, and neither do we. Golden Day was well aware, from both the law and its contracts, that it had the burden to support its claims for funds and that the Department would prorate total program costs between subsidized and nonsubsidized children. Golden Day points to no authority that would preclude it from obtaining these records to support its burden of proof.

The trial court rightly noted that "substantial evidence is all that is required to support the ALJ's decision, and [Clark] Parker's testimony [that he never saw nor allowed commingling] uncorroborated by documentation does not undermine it." We agree.

17

## B. *Dual Payroll Costs (Finding No. 4)*

The Department had no issues with the payroll costs of the majority of Golden Day's employees. However, in Finding No. 4, the Department determined that Golden Day charged to the Department payroll costs for 48 employees who also worked for Today's Fresh Start. The Department gave as an example Clark Parker's son-in-law, whose average monthly salary of $3,545 for 37.5 hours per week was charged by Golden Day to the Department, while the federal tax returns of Today's Fresh Start showed that he was paid an average monthly salary of $3,942 by that school. Given the overlapping operating hours of Golden Day (6:30 a.m. to 6:00 p.m.) and Today's Fresh Start (8:10 a.m. to 3:15 p.m.), the Department found it "[i]mpractical" that the 48 employees at issue could work the reported hours at both schools. The Department found that "[b]ased on Today's Fresh Start's official reports to the Los Angeles County Office of Education and to the Internal Revenue Service," the 48 employees were charter school employees. The Department "conducted further inquiry to determine whether it would be reasonable and necessary to allocate or share such payroll costs between Golden Day and Today's Fresh Start" by requesting payroll documents from Today's Fresh Start, which refused to provide them. As a result, the Department "determined that $930,657 in payroll costs relating to Today's Fresh Start were inappropriately charged to the child development program for the period July 1, 2006 through June 30, 2008."

At the hearing before the ALJ, the Department's supervising auditor explained that after Today's Fresh Start refused to produce its payroll records, the Department obtained a list of Today's Fresh Start's employees, copies of its federal reporting employee forms, its "Bell schedule" from the Los Angeles County Office of Education, and copies of each employee's federal

18

quarterly tax return. After reviewing these documents in conjunction with Golden Day's payroll records, the Department could not determine what roles these 48 dual employees served to benefit Golden Day's program. The Parkers responded that Golden Day does not share its child development costs with any other organization. The ALJ noted that while most of the employee time cards submitted by Golden Day identified the employee's position, none of the time cards identified the classes taught or the work assignments carried out. The ALJ also found that the time cards "were in fact completed subsequent to the pay period referenced in the time card, as evidenced by the uniformity of the hand written dates and times on each employee's time card," and that the time cards revealed that some employees worked on days when Golden Day was not operating. The ALJ found that the time cards "therefore were meaningless as evidence" to rebut the Department's allegation that Golden Day employees also worked for Today's Fresh Start. The ALJ concluded that the "testimony and documentary evidence presented was insufficient to support Golden Day's assertion that 'it does not share its child development cost with any other organization.'" The ALJ found it "very troubling" that Golden Day failed to produce payroll records from Today's Fresh Start, which would have resolved the issue. The ALJ found there was "a strong inference" that certain of Golden Day's employees were also working at Today's Fresh Start when they were paid for working at Golden Day, given that the schools were on the same campuses operated by the Parkers.

The trial court found that substantial evidence supported the ALJ's determination that payroll costs for dual employees were improperly charged to the Department. We agree.

19

Golden Day argues that the ALJ and the trial court reached their conclusions by relying on the following provisions in the contracts' Funding Terms and Conditions: "If the contractor has more than one [California Department of Education] program, then the method used to allocate administrative costs must be documented. [¶] If an employee is multi-funded on a time accounting basis, then the employee's time sheet must indicate the actual amount of time spent in each program per day."

Golden Day argues that these provisions are inapplicable because it does not operate more than one childcare and development program. While true, this does not render the second provision inapplicable. Contrary to Golden Day's assertion, these provisions are not interdependent. Golden Day calls the second provision "the second sentence," but the provisions appear as separate paragraphs among other paragraphs in the Funding Terms and Conditions. Indeed, employee compensation (payroll) and administrative costs are separate and independent reimbursable costs. (Cal. Code Regs. § 18034, subds. (c), (d).) The second provision does not state, as Golden Day asserts, that it only applies to employees who are multi-funded by "more than one *program* operated by a *single employer*." It merely states that if an employee is multi-funded (i.e., by more than one program), the employee's time sheet must indicate the actual amount of time spent in each program per day.

Golden Day is fond of the argument that if some of its employees also worked at a separate unrelated entity like Starbucks during their off hours, Golden Day would have no obligation to require these employees to document their time worked at Starbucks. This argument misses the point. Golden Day and Today's Fresh Start are not totally unrelated parties. Today's Fresh Start uses the same classrooms used by Golden Day at some of the same

20

sites, and Golden Day is operated by Clark Parker while Today's Fresh Start is operated by his wife, Jeanette Parker. As the trial court aptly stated, Today's Fresh Start is not Starbucks. Given this close relationship, Golden Day's argument that it should not have to produce Today's Fresh Start pay records is not well taken. As the trial court noted, the Department's analysis showed that employees who should have been at Today's Fresh Start during the charter school day were charging their time to Golden Day. Without Golden Day being able to identify the exact time its employees were spending at Today's Fresh Start, yet charging their pay to the Department, it was not unfair for the Department to disallow the entire payroll costs.

We agree with the trial court that in light of the evidence presented and Golden Day's failure to present evidence regarding the hours actually worked by employees at Golden Day and Today's Fresh Start, the ALJ's determination that payroll costs for dual employees were improperly charged to the Department is supported by substantial evidence.

### C. Nonreimbursable Expenditures (Finding No. 6)

In Finding No. 6, the Department determined that "Golden Day claimed reimbursement for $455,739 in unallowable, unnecessary, and unsupported costs to the child development program during the period July 1, 2006 through June 30, 2008." The Department set forth the numerous nonreimbursable expenditures, which included the following: Clark Parker's parking tickets; license renewal fees for his personal Rolls Royce and Mercedes; automobile insurance; gasoline; service and repair costs for the Mercedes; cancellation fees; late penalties; amusement; property taxes on his personal residence; rent for two leased properties not being used by Golden Day (including one that had burned and was unoccupied) and one that was being leased and used by Today's Fresh Start; umbrella insurance policies

covering properties occupied by Today's Fresh Start, other businesses, and Clark Parker's personal residence; plumbing repairs for a property not used by Golden Day; T-shirts for Today's Fresh Start; and expenditures incurred in prior fiscal years.

It is clear the ALJ painstakingly reviewed the nonreimbursable expenditures. The ALJ's written decision contains eight single-spaced pages discussing each one of the Department's identified nonreimbursable expenditures. For the majority, the ALJ found that, based on the documentary and testimonial evidence, the Department's findings were supported by substantial evidence. The trial court agreed.

On appeal, Golden Day does not identify, address, or in any way discuss a single item found by the Department to be nonreimbursable. Instead, it makes the sweeping argument that the ALJ and the trial court should have deferred to its judgment "about what it needs to operate the company successfully and to meet its contractual obligations." There is no merit to this argument.

"'Disallowed costs' means costs which have been incurred but are not reimbursable because they are not reasonable and/or necessary for the performance of the contract as defined in section 18013(s) of this Division or are nonreimbursable as specified in section 18035 of this Division." (Cal. Code Reg., tit. 5, § 18013, subd. (l).) Under California Code of Regulations, title 5, section 18013, subdivision (s), "'Reasonable and necessary costs' means expenditures that, in nature and amount, do not exceed what an ordinarily prudent person would incur in the conduct of a competitive business." Golden Day asserts this is akin to the "business judgment rule," where courts grant deference to an entity in its business-related decisions. Golden Day cites to *Lamden v. La Jolla Shores Clubdominium Homeowners*

*Assn.* (1999) 21 Cal.4th 249, 253, but this case is inapposite because it dealt with the deference to be given to the board of directors of a homeowners' association on the basis of statutory enactments and association covenants vesting the board with discretion over the choice of fumigation methods.

In contrast, the child development program has specific regulations detailing reimbursable and nonreimbursable costs. (Cal. Code Regs., tit. 5, §§ 18034, 18035.) Neither of these sections, nor California Code of Regulations, title 5, section 18013, instruct the Department to defer to the contracting entity's business judgment. Rather, it is the Department that determines whether a cost is reasonable and necessary in nature and amount by applying the ordinary person's judgment in operating a competitive business. The contractor has the burden of demonstrating that costs are appropriately charged to the contracts. (Cal. Code Regs., tit. 5, § 18067, subd. (b).) A contractor can certainly argue that prudent business judgment required it to incur various costs, but the Department is not required to defer to such judgment.

Golden Day's additional argument that the Department's acceptance of its independent financial and compliance audit in fact constituted acceptance of hundreds of underlying individual costs charged to the state contracts is also without merit. There is no regulatory or contract language stating that the determination of "reasonable and necessary" costs under California Code of Regulations, title 5, section 18013 is made by acceptance of the contractor's financial and compliance audits. Such construction of California Code of Regulations, title 5, section 18013 would undermine the Department's overall enforcement authority under Education Code section 8448 to conduct performance reviews. The aim of the contractor's independently prepared financial and compliance audit is to evaluate the overall financial position of

23

the entity.  The audit does not examine whether hundreds of individual costs charged to a state contract are reasonable and necessary for child development services and supported with proper documentation.

Golden Day has failed to meet its burden of demonstrating the ALJ's decision was not supported by substantial evidence.

## THE CROSS-APPEAL

In Finding No. 5, the Department determined that "Golden Day charged $593,774 in related-party lease payments that were not supported as being fair and reasonable for the period July 1, 2006 through June 30, 2008."[2] The evidence showed that in April 1980, Golden Day entered into a 20-year agreement to lease six properties owned by the Clarks for $6,250 per month.[3] In March 2000, Golden Day entered into a lease amendment to extend the lease for 10 years.  The amendment contained an automatic annual rental increase of a minimum of 5 percent.  In August 2001, Golden Day obtained an independent fair market rental estimate that appraised the rental value of the six properties at $50,377 per month.  No appraisals were obtained for any subsequent years.  As a result of the annual rental increases, as of June 2008, Golden Day was paying $80,406 per month to the Parkers.  In Finding No. 5, the Department stated that it accepted the fair market rate set in August 2001, but disallowed any rental increases above that amount as "not

[2]     The Department made additional determinations in Finding No. 5 regarding a sublease to Today's Fresh Start.  This part of Finding No. 5, however, is not addressed on appeal.

[3]     The ALJ noted that during the hearing "Golden Day submitted copies of Golden Day's board minutes indicating that Dr. Parker and his wife refrained from voting on the transaction involving the rental of property to Golden Day."  Golden Day cites us to a board resolution from 1980.  Our copy is illegible.  But it appears to be undisputed that the board's decision to enter into the initial lease was conducted at arm's length.

24

supported as being fair, reasonable, and in accordance with program requirements."

The ALJ agreed that without an annual fair market appraisal, Golden Day could not support the reasonableness of the annual rental increases. The trial court disagreed. Relying on the Funding Terms and Conditions in the contracts and Corporations Code section 5233, incorporated therein, as well as a Black's Law Dictionary definition of "transaction," the trial court concluded that the annual automatic rental increases did not constitute transactions, because there was no negotiation involved and therefore new appraisals were not required annually.

The Department argues the trial court improperly reviewed the applicable law and evidence in overturning the ALJ's ruling. We agree.

The Funding Terms and Conditions provide, under the heading "Conflicts of Interest," that for "any transaction to which the contractor is a party and the other party" is a "family member of a person having a financial interest in the contractor, the transaction(s) shall be fair and reasonable and conducted at arm's length." The Funding Terms and Conditions specifically incorporate various Corporations Code sections, including section 5233.[4] The

---

[4]     Corporations Code section 5233 defines a "self-dealing transaction" as "a transaction to which the corporation is a party and in which one or more of its directors has a material financial interest," and requires that the "transaction was fair and reasonable as to the corporation at the time the corporation entered into the transaction"; "the board authorized or approved the transaction in good faith by a vote of a majority of the directors then in office without counting the vote of the interested director or directors, and with knowledge of the material facts concerning the transaction and the director's interest in the transaction"; and "the board considered and in good faith determined after reasonable investigation under the circumstances that the corporation could not have obtained a more advantageous arrangement with reasonable effort under the circumstances."

Funding Terms and Conditions expressly state: "If the transaction involves the renting of property, either land or buildings, owned by affiliated organizations, officers or other key personnel of the contractor or their families, the board of directors shall request the interested party to obtain a 'fair market rental estimate' from an independent appraiser. . . . The contractor has the burden of supporting the reasonableness of rental costs."

Neither the Funding Terms and Conditions nor the Corporations Code sections incorporated therein defines "transaction." The trial court focused on the definition of transaction from Black's Law Dictionary (4th ed. 1968) at page 1668 as "the act of transacting or conducting any business; negotiation; management; proceeding; that which is done; an affair."[5] The trial court concluded that the "only acts of negotiation in the Golden Day/Parker related-party transaction were the initial lease and the 2000 lease extension to March 2010," because the annual rental increases were automatic. Therefore, the court found there was "no transaction for which an independent appraisal was required annually."

The trial court's focus on transactions as involving negotiations was too narrow and did not take into account the childcare and development regulatory scheme. As the Department points out, its regulations do not provide for or authorize preapproval of costs. Rather, the regulations make clear that Golden Day has the burden of producing sufficient documentation

---

[5] The Department complains that Golden Day first used the definition of "transaction" from Black's Law Dictionary in its reply brief to its petition for writ of mandamus and therefore it should have been disregarded. But we note that Golden Day actually used a different and more recent definition of "transaction" from Black's Law Dictionary (8th ed. 2004) at page 1535: "The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract."

26

to support the reasonableness of its charges—each fiscal year—to the publicly-funded, one-year contracts. (Cal. Code Regs., tit. 5, § 18067, subd. (b).) Where the charged expense is a related-party transaction, the Funding Terms and Conditions make clear that Golden Day must additionally establish the transaction as "fair and reasonable and conducted at arm's length." In a transaction involving the renting of property, this reasonableness requirement means that a "fair market rental estimate" must be obtained from an independent appraiser to establish that the rental amount is reasonable.

The Department and the ALJ interpreted these provisions to mean that every year Golden Day expended, and charged to the Department, additional money on increased rent, Golden Day was obligated to obtain a fair market rental estimate from an independent licensed appraiser to justify the increases. Such an interpretation makes sense. It cannot be said that a rental increase in one year is also fair and reasonable in another year.

On its face, the August 2001 appraisal addressed only the monthly rent as of August 2001. The 2001 appraisal did not offer any opinion on the propriety of a 5 percent annual increase in the monthly rent for any years, let alone fiscal years 2006-2007 and 2007-2008. Indeed, there is no indication in the appraisal that the lease agreement and its escalation clause were even reviewed by the appraiser or that any future rental value was ever evaluated or assessed. As stated in the 2001 appraisal report, the purpose of the appraisal was to serve Clark Parker's "business planning" needs. There is no stated intention to provide an appraisal for purposes of increasing the rent in future years or obtaining reimbursement under future child development contracts. Because the 2001 appraisal report addressed only the fair rental value for 2001, the ALJ properly found Golden Day did not meet its burden of

showing the rental increases were fair and reasonable in fiscal years 2006-2007 and 2007-2008.  The Department is therefore entitled to recoup rental amounts paid above the 2001 appraisal amount.

**DISPOSITION**

The judgment is reversed as to the trial court's ruling on Finding No. 5 as discussed above.  In all other respects, the judgment is affirmed.  The Department is entitled to recover its costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**.


_____, Acting P. J.
        ASHMANN-GERST


We concur:


_____, J.
     HOFFSTADT


_____, J.*
     GOODMAN


---

\*     Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.